Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone:  (818) 839-2333
Facsimile:  (818) 986-9698

Attorneys for Plaintiffs
GLORIA STITT, RONALD STITT, JUDI
SHATZER, MARK ZIRLOTT, and TERRI
LOUISE ZIRLOTT, individually, and on
behalf of other members of the public
similarly situated

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLORIA STITT, RONALD STITT, JUDI SHATZER, MARK ZIRLOTT, and TERRI LOUISE ZIRLOTT, individually, and on behalf of other members of the general public similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> CITIBANK, N.A., a national association, and CITIMORTGAGE, INC., a New York corporation, <br><br> Defendants. | Case Number: CV 12 3892 EDL <br><br> **CLASS ACTION COMPLAINT FOR:** <br><br> (1) Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(c)) <br><br> (2) Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(d)); <br><br> (3) Unjust Enrichment; and <br><br> (4) Fraud <br><br> **Jury Trial Demanded** |

For their complaint against Citibank, N.A., and CitiMortgage, Inc. (collectively "Defendants"), Plaintiffs Gloria Stitt, Ronald Stitt, Judi Shatzer, Mark Zirlott, and Terri Louise Zirlott ("Plaintiffs"), individually, and on behalf of all other members of the public similarly situated, based on information and belief, allege as follows:

## **NATURE OF THE ACTION**

1.    Plaintiffs' claims against Defendants in this action were originally brought as part of the action captioned as *Bias et al. v. Wells Fargo & Company et al.*, case no. 4:12-cv-00664-YGR (N.D. Cal., filed Feb. 10, 2012). However, by Order dated July 13, 2012, this Court, the Honorable Yvonne Gonzalez Rogers presiding, found, on the Court's own motion, that the claims with respect to the Defendants in this action were not properly joined in a single action with the claims against the other defendants in the *Bias* action. As a result, the Court ordered Plaintiffs "to re-file their claims against [Defendants as an] additional, separate action."[1] Accordingly, consistent with the Court's order, Plaintiffs hereby bring this separate action against Citibank, N.A., and CitiMortgage, Inc.

2.    This case concerns fraudulent practices committed by Defendants in connection with their home mortgage loan servicing businesses. Taking advantage of economic downturn and the increasing number of loans in default, Defendants formed an enterprise to service these loans according to uniform practices designed to maximize fees assessed on borrowers' accounts when they are behind on their payments. Consistent with these practices, Defendants use automated mortgage loan management systems, made up of an enterprise of subsidiaries, inter-company departments, divisions, and third-party "property preservation" vendors, to engage in a scheme to conceal the unlawful assessment of improperly marked-up or unnecessary third party fees for default-related services, cheating borrowers who can least afford it.

---

[1] *See Bias et al. v. Wells Fargo & Company et al.*, N.D. Cal., case no. 4:12-cv-00664-YGR, *Order Granting in Part and Denying in Part Motion of Defendants Wells Fargo & Company and Wells Fargo Bank, N.A. to Sever and Transfer, and Severing Claims as to Other Defendants on the Court's Own Motion*, July 13, 2012 (Dkt. No. 59).

---

3.     More specifically, when home mortgage borrowers get behind on their payments and go into "default," Defendants assess fees on borrowers' accounts for various default-related services, typically performed by third parties, purportedly designed to protect the lender's interest in the property. However, Defendants are not permitted to mark-up the fees for such services to earn a profit. Nor are Defendants permitted to assess borrowers' accounts for default-related service fees that are unnecessary. Nevertheless, as discussed in detail below, using false pretenses to conceal the truth from borrowers, that is precisely what Defendants do.

4.     In effect, to generate hefty profits, the lending industry has substituted inflated interest rates with inflated fees. Defendants formed enterprises, associations of subsidiaries, affiliated companies, and "property preservation" vendors, and designed schemes to disguise hidden, marked-up, or unnecessary fees so that they could earn additional, undisclosed profits. Through these unlawful enterprises, Defendants mark-up the fees charged by vendors, often by 100% or more, and then, without disclosing the mark-up, assess borrowers' accounts for the hidden profits. Furthermore, in connection with their schemes, Defendants also have a practice of routinely assessing fees for default-related services, even when they are unnecessary. Employing this strategy, Defendants are able to quietly profit from default-related service fees at the expense of struggling consumers.

5.     Many borrowers reasonably believe the lender from whom they obtained their mortgage will hold and service their loan until it is paid off. Instead, however, through relatively recent mortgage industry practices, such as securitization and the sale of mortgage backed securities, that is often not the case. In today's market, loans and the rights to service them are bought and sold at will, multiple times over.

6.     A borrower's relationship is typically with the mortgage servicer rather than the lender who originated the loan. CitiMortgage, Inc. is one of the largest mortgage servicers in the United States. As a mortgage servicer, CitiMortgage, Inc. is responsible for the day-to-day management of loan accounts, including handling customer inquiries,

1 collecting and crediting loan payments, sending default notices to delinquent borrowers,
2 negotiating loan modifications, and directing foreclosure activities, including engaging the
3 services of foreclosure counsel, even if the foreclosure is brought in the name of the
4 owner of the loan, rather than the servicer.

5     7.     Borrowers depend on their mortgage servicers to handle servicing-related
6 tasks accurately and with skill. Because financial institutions like Citibank, N.A. who
7 generate loan servicing revenue through operating subsidiaries like CitiMortgage, Inc., do
8 not profit directly from interest payments made by borrowers, rather than ensuring that
9 borrowers stay current on their loans, Defendants are more concerned with generating
10 revenue from fees assessed against the mortgage accounts they service. According to one
11 member of the Board of Governors of the Federal Reserve System, "a foreclosure almost
12 always costs the investor [who owns the loan] money, but [it] may actually earn money
13 for the servicer in the form of fees."[2]

14     8.     Financial institutions like Defendants see opportunity where investors see
15 failure because borrowers are captives to companies who service their loans.
16 Accordingly, when borrowers go into default and Defendants unilaterally decide to
17 instruct third parties to perform default-related services, borrowers have no option but to
18 accept Defendants' choice of providers.

19     9.     Taking advantage of these circumstances, the Defendants formed an
20 enterprise with their respective subsidiaries, affiliates, and "property preservation"
21 vendors, and then, developed a uniform practice of unlawfully marking up default-related
22 fees charged by third parties and assessing them against borrowers' accounts so that
23 Defendants can earn undisclosed profits in connection with these services.

24     10.     Defendants are aware that it is improper to mark-up the fees assessed on
25

26     [2] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the*
27 *National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov. 12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Jan.
28 23, 2012).

3

1 borrowers' accounts for default-related services. Therefore, Defendants fraudulently
2 conceal these fees on borrowers' accounts, omitting any information about Defendants'
3 additional profits, by identifying them on mortgage statements with cryptic descriptions,
4 such as "Delinquency Expenses."

5     11.   Indeed, Defendants' practices are designed to avoid detection even when
6 examined in bankruptcy proceedings. As one court has explained, "[l]enders have
7 apparently been operating under the assumption that the fees and costs in their proofs of
8 claim are invulnerable to challenge because debtors lack the sophistication, the debtors'
9 bar lacks the financial motivation, and bankruptcy courts lack the time."[3] "[T]he Court
10 believes that certain members of the mortgage industry are *intentionally* attempting to
11 game the system by requesting undocumented and potentially excessive fees."[4]

12     12.   The rampant abuses by mortgage servicers have led federal regulators to
13 enter into numerous Consent Orders, but according to Mark Pearce, Director, Division of
14 Depositor and Consumer Protection, Federal Deposit Insurance Corporation, "these
15 consent orders do not fully identify and remedy past errors in mortgage-servicing
16 operations of large institutions; in fact, the scope of the interagency review did not
17 include a review of . . . the fees charged in the servicing process. Much work remains to
18 identify and correct past errors and to ensure that the servicing process functions
19 effectively, efficiently, and fairly going forward."[5] Moreover, the Consent Orders do not
20 reach the type of conduct at issue here.

21     13.   Plaintiffs bring this action, seeking injunctive relief and damages on behalf of
22

---

23 [3] *In re: Prevo*, 394 B.R. 847, 848 (Bankr. S.D. Tex. 2008).

24 [4] *Id.* at 851 (emphasis added).

25 [5] *See* Mark Pearce, Director, Division of Depositor and Consumer Protection, Federal Deposit Insurance
26 Corporation, *Mortgage Servicing: An Examination of the Role of Federal Regulators in Settlement
Negotiations and the Future of Mortgage Servicing Standards*, before the Subcommittees on Financial
27 Institutions and Consumer Credit, and Oversight and Investigations Committee on Financial Services,
U.S. House of Representatives, July 7, 2011, available at
28 http://financialservices.house.gov/UploadedFiles/070711pearce.pdf (last visited, Feb. 1, 2012).

themselves and the thousands of borrowers who have been victimized by the Defendants' uniform schemes.

### JURISDICTION AND VENUE

14.    Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the class of plaintiffs are citizens of states different from Defendants.  Further, greater than two-thirds of the members of the Class reside in states other than the states in which Defendants are a citizens.

15.    This Court also has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1961, 1962 and 1964.  This Court has personal jurisdiction over Defendants under 18 U.S.C. §1965.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding.

16.    Venue lies within this judicial district under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendants' contacts are sufficient to subject them to personal jurisdiction in this District, and therefore, Defendants reside in this District for purposes of venue, or under 28 U.S.C. § 1391(b)(2) because certain acts giving rise to the claims at issue in this Complaint occurred, among other places, in this District.

### Intradistrict Assignment

17.    Consistent with Northern District of California Civil Local Rule 3-5(b), assignment to the San Francisco or Oakland Division is appropriate under Civil Local Rules 3-2(c) and 3-2(d), because acts giving rise to the claims at issue in this Complaint occurred, among other places, in this District, in the San Francisco and Oakland.

**PARTIES**

18. Plaintiff Gloria Stitt is an individual and a citizen of New York.

19. Plaintiff Ronald Stitt is an individual and a citizen of New York.

20. Plaintiff Judi Shatzer is an individual and a citizen of Maryland.

21. Plaintiff Mark Zirlott is an individual and a citizen of Alabama.

22. Plaintiff Terri Louise Zirlott is an individual and a citizen of Alabama.

23. Defendant Citibank, N.A. is a national bank organized and existing as a national association under the National Bank Act, 12 U.S.C. §§ 21 *et seq*., with its principal place of business in New York, New York, and is a subsidiary of Citicorp, and is the parent corporation of CitiMortgage, Inc.

24. Defendant CitiMortgage, Inc. is a subsidiary of Citibank, N.A., and is a New York corporation, with its principal place of business in O'Fallon, Missouri.

25. Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendants committed in connection with the enterprise, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

26. Plaintiffs are informed and believe, and based thereon, allege that, at all material times herein, each Citi defendant, Citibank, N.A. and CitiMortgage, Inc. (collectively, "Citi"), was the agent, servant, or employee of, and acted within the purpose, scope, and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other Citi defendant, and ratified and approved the acts of the other Citi defendant.

27. Citibank, N.A. exercises specific and financial control over the operations of CitiMortgage, Inc., and it dictates the policies and practices of CitiMortgage, Inc. Citibank, N.A. also exercises power and control over the specific activities at issue in this lawsuit, and it is the ultimate recipient of the ill-gotten gains described herein. Citigroup,

6

1 Inc., the parent company of both Citibank, N.A. and CitiMortgage, Inc., represents that it

2 brings "the power of one Citi to our Citi Smith Barney, Citibank, CitiMortgage, Citi

3 Cards, and Student Loan clients" by "Serving clients as one company."[6] The fraudulent

4 scheme at issue in this case was organized by executives working at the highest levels of

5 Citibank, N.A. and CitiMortgage, Inc., and carried out by both executives and subordinate

6 employees.

7                                   **FACTUAL BACKGROUND**

8          28.    America's lending industry is in turmoil, and the lending community has

9 divorced itself from the borrowers it once served.  Traditionally, when people wanted to

10 borrow money, they went to a bank or a "savings and loan."  Banks loaned money and

11 borrowers promised to repay the bank, with interest, over a specific period of time.  The

12 originating bank kept the loan on its balance sheet, and serviced the loan -- processing

13 payments, and sending out applicable notices and other information -- until the loan was

14 repaid.  The originating bank had a financial interest in ensuring that the borrower was

15 able to repay the loan.

16         29.    Today, however, the process has changed.  Mortgages are now packaged,

17 bundled, and sold to investors on Wall Street through what is referred to in the financial

18 industry as mortgage backed securities or MBS.  This process is called securitization.

19 Securitization of mortgage loans provides financial institutions like Defendants with the

20 benefit of immediately being able to recover the amounts loaned.  Securitization

21 essentially eliminates the bank's risk from potential default.  But, by eliminating the risk

22 of default, mortgage backed securities have disassociated the lending community from

23 borrowers.  Numerous unexpected consequences have resulted from the divide between

24 lenders and borrowers.

25         30.    Among other things, securitization has created an industry of companies in

26 _____

27 [6] *See* Citigroup, Inc. 2006 Annual Report, available at
http://www.citigroup.com/citi/investor/quarterly/2007/ar06c_en.pdf?ieNocache=809 (last visited July 23,

28 2012).

the lending industry like Defendants, who no longer make money primarily from interest on the loans they originate.  Thus, lenders no longer have the financial interest in the repayment of loans that they once did.  Instead, financial institutions like Defendants, through their network of subsidiaries, operating entities and divisions, service or administer mortgages for hedge funds and investment houses who own the loans.  Rather than earn income from the interest on these loans, financial institutions like Defendants are paid a fee for their loan administration services.

31.    Additionally, under agreements with investors (pooling and service agreements), loan servicers like Defendant CitiMortgage, Inc. assess fees on borrowers' accounts for default-related services in connection with their administration of borrowers' loans.  These fees include Broker's Price Opinion fees and appraisal fees.  Defendants' collection of these fees, however, exemplifies how America's lending industry has run off the rails.

32.    As one Member of the Board of Governors of the Federal Reserve System has explained, "[w]hile an investor's financial interests are tied more or less directly to the performance of a loan, the interests of a third-party servicer are tied to it only indirectly, at best.  The servicer makes money, to oversimplify it a bit, by maximizing fees earned and minimizing expenses while performing the actions spelled out in its contract with the investor. . . . The broad grant of delegated authority that servicers enjoy under pooling and servicing agreements (PSAs), combined with an effective lack of choice on the part of consumers, creates an environment ripe for abuse."[7]

33.    For financial institutions like Defendants, who are determined to maximize the money they earn for servicing loans, the right to charge servicing fees has opened the door to a world of exploitation.  As a result of the disassociation between loan servicers

---

[7] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov. 12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Jan. 23, 2012).

1  and the monies generated from the interest borrowers pay on their loans, Defendants have
2  been incentivized to find other ways to grow their profits.

3      34.    Defendants, with their subsidiaries, affiliated companies, intercompany
4  divisions, and third-party "property preservation" vendors, formed an unlawful enterprise
5  and decided to game the system, under the guise of collecting default-related service fees,
6  charged by third parties, and then, they sought to increase mortgage servicing revenues by
7  fraudulently concealing marked-up or unnecessary fees assessed on borrowers' accounts.

8      35.    In short, as explained by Adam J. Levitin, Associate Professor of Law at the
9  Georgetown University Law Center, in testimony to the United States House Financial
10  Services Committee, Subcommittee on Housing and Community Opportunity, "Servicers'
11  business model also encourages them to cut costs wherever possible, even if this involves
12  cutting corners on legal requirements, and to lard (sic) on junk fees and in-sourced
13  expenses at inflated prices."[8]

14              **DEFENDANTS' AUTOMATED LOAN SERVICING PRACTICES**

15      36.    To maximize profits, Defendants assign the complex task of administering
16  these millions of loans to computer software programs. The software programs are
17  designed to manage borrowers' accounts and assess fees, according to protocols and
18  policies designed by the executives at Citibank, N.A. and its operating subsidiary,
19  CitiMortgage, Inc.

20      37.    Citi automates its loan servicing business primarily through two computer
21  software programs, which are called CitiLink and Maestro. CitiLink and Maestro are
22  proprietary to Citi. Citi also uses a program called DRI, which is a case management,
23  communications, and recordkeeping software system for default-related matters.

24      38.    CitiLink and Maestro contain information relating to the origination,
25

26  [8] *See* Adam J. Levitin, *Robo-Singing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage*
27  *Servicing*, before the House Financial Services Committee, Subcommittee on Housing and Community
    Opportunity, Nov. 18, 2010, available at
28  http://financialservices.house.gov/Media/file/hearings/111/Levitin111810.pdf (last visited Feb. 1, 2012).

1  payment, interest, and fees concerning mortgages serviced by CitiMortgage, Inc.
2  Management of payment information for loans serviced by Citi is automated by CitiLink
3  and Maestro. When borrowers send payment checks to Citi, the payments are
4  automatically loaded into CitiLink or Maestro. Payments made over the phone or on the
5  Internet are automatically fed into CitiLink or Maestro as well.

6      39.    Based on parameters inputted into these programs, Citi's computer systems
7  automatically implement decisions about how to manage borrowers' accounts based on
8  internal software logic. Among other things, if a loan in Citi's systems is past due, the
9  internal software logic in CitiLink and Citi's other loan management programs is designed
10  to automatically assess late fees, default-related service fees, and other charges against
11  borrowers' accounts.

**MARKED-UP AND UNNECESSARY THIRD PARTY FEES
FOR DEFAULT-RELATED SERVICES**

14      40.    In their loan servicing operations, Defendants follow a strategy to generate
15  fraudulently concealed default-related fee income. Rather than simply obtain default-
16  related services directly from independent third-party vendors, and charge borrowers for
17  the actual cost of these services, Defendants assess borrowers' accounts for services that
18  are unnecessary and they unlawfully add additional, undisclosed profits on to the third
19  party charges before they are assessed on borrowers' accounts.

20      41.    Defendants' scheme works as follows. Defendants order default-related
21  services from their subsidiaries and affiliated companies, who, in turn, obtain the services
22  from third-party vendors. The third-party vendors charge Defendants for their services.
23  Defendants, in turn, assess borrowers a fee that is significantly marked-up from the third-
24  party vendors' actual fees for the services. As a result, even though the mortgage market
25  has collapsed, and more and more borrowers are falling into delinquency, Defendants
26  continue to earn substantial profits by assessing undisclosed, marked-up fees for default-
27  related services on borrowers' accounts.

28

10

42.   The mortgage contract between a lender and a borrower generally consists of two documents: the promissory note ("Note") and the mortgage or deed of trust ("Security Instrument"). The mortgage contacts serviced by Defendants are substantially similar because they conform to the standard Fannie Mae/Freddie Mac form contract. These contracts contain disclosures regarding what occurs if borrowers default on their loans. The Security Instrument discloses to borrowers that, in the event of default, the loan servicer will:

> pay for whatever is reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, including protecting and/or assessing the value of the property, and securing and/or repairing the property.

43.   The Security Instrument further discloses that any such amounts disbursed by the servicer shall become additional debt of the borrower secured by the Security Instrument and shall bear interest at the Note rate from the date of disbursement. The Note further discloses that the note holder:

> will have the right to be paid back by [the borrower] for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

Thus, the mortgage contract discloses to borrowers that the servicer will pay for default-related services when necessary, and will be reimbursed by the borrower. Nowhere is it disclosed to borrowers that the servicer may mark-up the actual cost of those services to make a profit, nor does it permit such fees to be assessed on borrowers' accounts when they are unnecessary.

1    44.    Broker's Price Opinions ("BPOs") are a significant category of default-
2  related service fees that, in furtherance of Defendants' unlawful enterprises, are assessed
3  on borrowers' accounts with substantial, undisclosed mark-ups, fraudulently generating
4  revenue in the loan servicing business.

5    45.    As discussed above, by charging marked-up fees for BPOs, Defendants
6  violate the disclosures made to borrowers. Furthermore, the wrongful nature of the
7  marked-up fees is demonstrated by the fact that Defendants conceal the marked-up profits
8  assessed on borrowers' accounts.

9    46.    Although Defendants assess fees for BPOs on borrowers' accounts in
10  amounts ranging from approximately $85 to $105, as of December 2010, under Fannie
11  Mae guidelines, the maximum reimbursable rate for an exterior BPO is $80,[9] and in
12  practice, the actual cost is much less. According to the National Association of BPO
13  Professionals, the actual cost of a BPO may be as little as $30.[10]

14    47.    Defendant Citibank, N.A., its subsidiary, defendant CitiMortgage, Inc., and
15  their "property preservation" vendors, and the real estate brokers who provide BPOs for
16  Citi, formed an enterprise and devised a scheme to defraud borrowers and obtain money
17  from them by means of false pretenses.

18    48.    CitiMortgage, Inc. is the fourth-largest servicer in the United States.
19  CitiMortgage, Inc. services approximately 4 million loans, and approximately 20% of
20  those loans concern properties in California.

21    49.    Plaintiffs are informed and believe, and on that basis, allege that using the
22  enterprise and Citi's automated mortgage loan management system, Citi conceals marked-
23  up or unnecessary fees for default-related services on borrowers accounts, by identifying
24  the charges only as "Delinquency Expenses" on borrowers' statements. Under the this

25
26    [9] *See* Fannie Mae, *Broker Price Opinion Providers and Pricing Structure*, available at
    https://efanniemae.com/sf/guides/ssg/annltrs/pdf/2010/ntce121710a.pdf (last visited Feb. 1, 2012).
27    [10] *See* National Association of BPO Professionals (NABPOP), *Broker Price Opinion – BPO Brief*,
28  available at http://www.nabpop.org/Advocacy-BPOBrief-2.php (last visited Feb. 2, 2012).

category of charges, Citi assesses fees for BPOs on borrowers' accounts, in amounts ranging from $84 to $105, when in fact, on information and belief, the actual cost of each BPO is approximately $50 or less.

50.    Plaintiffs are informed and believe, and on that basis, allege that under the "Delinquency Expenses" category on borrowers' statements, Citi also assesses unnecessary fees for property inspections. In order to generate profits from these fees, Citi's automated loan management system is set up to order property inspections and assess fees against borrowers when they are a certain number of days late on their mortgage, regardless of whether the assessment of such fees is necessary. Although such inspections purportedly are conducted to guard against property loss, Citi's practices are designed to ensure that these fees are charged to as many accounts as possible, even if the inspections are unnecessary.

51.    Plaintiffs are informed and believe, and on that basis, allege that guidelines inputted into Citi's loan management software system automatically trigger property inspections if a loan is past due by a certain number of days. Plaintiffs are informed and believe, and on that basis, allege that after a borrower's account is past due by a set number of days, as inputted into the software, Citi's computer automatically generates a work order for a property inspection without human intervention. Moreover, so long as a borrower's account is past due by the requisite number of days inputted into the loan management software, Citi's system automatically continues to order inspections, regardless of whether they are necessary.

52.    Plaintiffs are informed and believe, and on that basis, allege that even if the property inspections were properly performed and actually reviewed by someone at the bank, Citi's continuous assessment of fees for these inspections on borrowers accounts is still improper because of the frequency with which they are performed. If the first inspection report shows that the property is occupied and in good condition, it is unnecessary and inappropriate for Citi's system to automatically continue to order monthly inspections. Nothing in the reports justifies continued monitoring.

53.    As a result of Citi's unlawful enterprise, hundreds of thousands of unsuspecting borrowers are cheated out of millions of dollars.

## BORROWERS SUFFER HARM
## AS A RESULT OF DEFENDANTS' PRACTICES

54.    In addition to the direct monetary damages caused to borrowers, in the form of the difference between the actual cost of the services provided and the marked-up fees assessed on borrowers' accounts, borrowers suffer other, less obvious injuries as a result of the practices described herein.

55.    The assessment of these marked-up fees can make it impossible for borrowers to become current on their loan. Charges for default-related services can add hundreds or thousands of dollars to borrowers' loans over time, driving them further into default.

56.    When borrowers get behind on their mortgage, and fees for these default-related services are stacked on to the past-due principal and interest payments, Defendants' practices make it increasingly difficult for borrowers to ever bring their loan current. Even if borrowers pay the delinquent principal and interest payments, the marked-up fees for default-related services ensure that borrowers stay in default. After paying delinquent principal and interest, although the next payment comes in on time, often through automatic payment deductions from borrowers' bank accounts, part of the payment is applied to the fees first, so there is not enough to cover the entire monthly payment. This makes that payment late, creating a cascade of more fees, and more arrears, that keeps borrowers in delinquency. By the time borrowers are aware, Defendants are threatening to foreclose unless a huge payment is made, and the weight of these unnecessary fees drops borrowers into a financial abyss.

57.    As a result of Defendants' practices, which force borrowers to move deeper into default, borrowers suffer damage to their credit score. Defendants provide information about borrowers' payment history to credit reporting companies, including whether they have been late with a payment or missed any payments. By keeping

1 borrowers in default with these practices, Defendants affect whether borrowers can get a
2 loan in the future – and what borrowers' interest rate will be on such loans.

3   58.   Additionally, as a result of Defendants' practices, which force borrowers to
4 move deeper into default, borrowers are driven into foreclosure.

5                    **PLAINTIFFS' CLAIMS AGAINST CITI**

6   59.   Plaintiff Gloria Stitt is a resident of New York County, New York.

7   60.   Plaintiff Ronald Stitt is a resident of New York County, New York.

8   61.   Plaintiffs Gloria and Ronald Stitt have a mortgage serviced by CitiMortgage.

9   62.   Citi continually assessed fees for default-related services, including property
10 inspections, on the mortgage account of Plaintiffs Gloria and Ronald Stitt, as early as
11 April 19, 2010. On mortgage statements provided to Plaintiffs Gloria and Ronald Stitt,
12 such fees were identified as "Delinquency Expenses." Although some mortgage
13 statements stated, "Delinquency expenses are third-party expenses such as property
14 inspection fees, property preservation costs, appraisal costs, and attorneys fees incurred by
15 CMI as a result of default," Citi did not adequately disclose the true nature of the fees
16 assessed against the account of Plaintiffs Gloria and Ronald Stitt. Mortgage statements
17 provided by Citi did not disclose that the such fees may contain mark-ups, nor did they
18 state exactly which of those categories of fees were assessed against the account of
19 Plaintiffs Gloria and Ronald Stitt, and they did not state if the fees identified as
20 "Delinquency Expenses" included more than one category of fee. Additionally, by
21 merely stating, "such as," and giving a list of potential types of fees, Citi leaves borrowers
22 unable to know if there are other categories of fees that are assessed under the
23 "Delinquency Expenses" description.

24   63.   Defendants alone maintain a complete accounting of all fees assessed and
25 paid, and the details of each and every fee assessed and paid cannot be alleged with
26 complete precision without access to Defendants' records. Nevertheless, Plaintiffs are
27 informed and believe, and on that basis allege, that Plaintiffs Gloria and Ronald Stitt paid
28 some or all of the unlawful fees assessed on their account.

64. Plaintiff Shatzer is a resident of Carroll County, Maryland.

65. Plaintiff Shatzer has a mortgage serviced by CitiMortgage.

66. Citi continually assessed fees for default-related services, including property inspections, on the mortgage account of Plaintiff Shazter. From January 2009 to February 2012, Citi assessed fees for more than 30 property inspections. On mortgage statements provided to Plaintiff Shatzer, such fees were identified as "Delinquency Expenses." Although some mortgage statements stated, "Delinquency expenses are third-party expenses such as property inspection fees, property preservation costs, appraisal costs, and attorneys fees incurred by CMI as a result of default," Citi did not adequately disclose the true nature of the fees assessed against Plaintiff Shatzer's account. Mortgage statements provided by Citi did not disclose that the such fees may contain mark-ups, nor did they state exactly which of those categories of fees were assessed against Plaintiff Shatzer's account, and they did not state if the fees identified as "Delinquency Expenses" included more than one category of fee. Additionally, by merely stating, "such as," and giving a list of potential types of fees, Citi leaves borrowers unable to know if there are other categories of fees that are assessed under the "Delinquency Expenses" description.

67. Defendants alone maintain a complete accounting of all fees assessed and paid, and the details of each and every fee assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege, that Plaintiff Shatzer paid some or all of the unlawful fees assessed on her account.

68. Plaintiff Mark Zirlott is a resident of Mobile County, Alabama

69. Plaintiff Terri Louise Zirlott is a resident of Mobile County, Alabama.

70. Plaintiffs Mark and Terri Zirlott have have a mortgage serviced by CitiMortgage.

71. Citi continually assessed fees for default-related services, including property inspections, on the mortgage account of Plaintiffs Mark and Terri Louise Zirlott, as early as April 19, 2009. From April 2009 to March 2010, Citi assessed fees for twelve property

1 inspections. On mortgage statements provided to Plaintiffs Mark and Terri Louise Zirlott,
2 such fees were identified as "Delinquency Expenses." Although some mortgage
3 statements stated, "Delinquency expenses are third-party expenses such as property
4 inspection fees, property preservation costs, appraisal costs, and attorneys fees incurred by
5 CMI as a result of default," Citi did not adequately disclose the true nature of the fees
6 assessed against the account of Plaintiffs Mark and Terri Louise Zirlott. Mortgage
7 statements provided by Citi did not disclose that such fees may contain mark-ups, nor did
8 they state exactly which of those categories of fees were assessed against the account of
9 Plaintiffs Mark and Terri Louise Zirlott, and they did not state if the fees identified as
10 "Delinquency Expenses" included more than one category of fee. Additionally, by
11 merely stating, "such as," and giving a list of potential types of fees, Citi leaves borrowers
12 unable to know if there are other categories of fees that are assessed under the
13 "Delinquency Expenses" description.

14     72. Defendants alone maintain a complete accounting of all fees assessed and
15 paid, and the details of each and every fee assessed and paid cannot be alleged with
16 complete precision without access to Defendants' records. Nevertheless, Plaintiffs are
17 informed and believe, and on that basis allege, that Plaintiffs Mark and Terri Louise
18 Zirlott paid some or all of the unlawful fees assessed on their account

19 **STATUTE OF LIMITATIONS**

20     73. Any applicable statutes of limitations have been tolled by Defendants'
21 knowing and active concealment, denial, and misleading actions, as alleged herein.
22 Plaintiffs and members of the Class, as defined below, were kept ignorant of critical
23 information required for the prosecution of their claims, without any fault or lack of
24 diligence on their part. Plaintiffs and members of the Class could not reasonably have
25 discovered the true nature of the Defendants' marked-up fee scheme.

26     74. Defendants are under a continuous duty to disclose to Plaintiffs and members
27 of the classes the true character, quality, and nature of the fees they assess on borrowers'
28 accounts. Defendants knowingly, affirmatively, and actively concealed the true character,

quality, and nature of their assessment of marked-up fees against borrowers' accounts. Plaintiffs and members of the Class reasonably relied upon Defendants' knowing, affirmative, and active concealment. Based on the foregoing, Defendants are estopped from relying on any statutes of limitation as a defense in this action.

75. The causes of action alleged herein did or will only accrue upon discovery of the true nature of the charges assessed against borrowers' accounts, as a result of Defendants' fraudulent concealment of material facts. Plaintiffs and members of the Class did not discover, and could not have discovered, through the exercise of reasonable diligence, the true nature of the unlawful fees assessed against their accounts.

76. Legal scholars have explained that, as a result of these deceptive practices, it is impossible for borrowers to determine that they are victims of these violations, because "without a true itemization that identifies the nature of each fee, parties cannot verify that a mortgage claim is correctly calculated . . . the servicer could be overreaching and charging fees that are not permitted by law or by the terms of the contract. . . . By obscuring the information needed to determine the alleged basis for the charges, servicers thwart effective review of mortgage claims. The system can only function as intended if complete and appropriate disclosures are made."[11]

77. Additionally, judges examining similar conduct have found that, "[a]t the heart of the problem is [the loan servicer's] failure to disclose to its borrowers/debtors, the trustee, or the Court, the nature or amount of fees and charges assessed . . . [l]ack of disclosure facilitates the injury. Naive borrowers/debtors, trustees and creditors rightly assume that [the loan servicer] is complying with the plain meaning of its notes, mortgages, court orders and confirmed plans. Why would anyone assume otherwise? . . . How are they to challenge a practice or demand correction of an error they do not know exists."[12]

---

[11] *See* Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87 Tex. L. Rev. 121, 155 (2008).

[12] *See In re: Jones*, 418 B.R. 687, 699 (E.D. La. 2009).

## CLASS ACTION ALLEGATIONS

78.     Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action under Rule 23 of the Federal Rules of Civil Procedure.

79.     The class Plaintiffs seek to represent (collectively, the "Class") is defined as follows:

> All residents of the United States of America who had a loan serviced by CitiMortgage and whose accounts were assessed fees for default-related services, including Broker's Price Opinions, and inspection fees, at any time, continuing through the date of final disposition of this action.

80.     Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveals that the Class should be expanded or otherwise modified.

81.     Plaintiffs reserve the right to establish sub-classes as appropriate.

82.     This action is brought and properly may be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3), and satisfies the requirements thereof. As used herein, the term "Class Members" shall mean and refer to the members of the Class.

83.     Community of Interest: There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

84.     Numerosity: While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants. At this time, Plaintiffs are informed and believe that the Class includes hundreds of thousands of members. Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

1     85.   Ascertainablity: Names and addresses of members of the Class are available
2 from Defendants' records. Notice can be provided to the members of the Class through
3 direct mailing, publication, or otherwise using techniques and a form of notice similar to
4 those customarily used in consumer class actions arising under California state law and
5 federal law.

6     86.   Typicality: Plaintiffs' claims are typical of the claims of the other members
7 of the Class which they seek to represent under Federal Rule of Civil Procedure 23(a)(3)
8 because each Plaintiff and each member of the Class has been subjected to the same
9 deceptive and improper practices and has been damaged in the same manner thereby.

10     87.   Adequacy: Plaintiffs will fairly and adequately represent and protect the
11 interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4).
12 Plaintiffs are adequate representatives of the Class, because they have no interests which
13 are adverse to the interests of the members of the Class. Plaintiffs are committed to the
14 vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who
15 are competent and experienced in handling class action litigation on behalf of consumers.

16     88.   Superiority: A class action is superior to all other available methods of the
17 fair and efficient adjudication of the claims asserted in this action under Federal Rule of
18 Civil Procedure 23(b)(3) because:

19          (a)   The expense and burden of individual litigation make it economically
20                unfeasible for members of the Class to seek to redress their claims
21                other than through the procedure of a class action.

22          (b)   If separate actions were brought by individual members of the Class,
23                the resulting duplicity of lawsuits would cause members to seek to
24                redress their claims other than through the procedure of a class action;
25                and

26          (c)   Absent a class action, Defendants likely would retain the benefits of
27                their wrongdoing, and there would be a failure of justice.

28     89.   Common questions of law and fact exist as to the members of the Class, as

required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3).

90.   The common questions of fact include, but are not limited to, the following:

(a)   Whether Defendants engaged in unlawful, unfair, misleading, or deceptive business acts or practices in violation of California Business & Professions Code sections 17200 *et seq.*;

(b)   Whether Defendants' practice of charging marked-up fees to borrowers, as alleged herein, is illegal;

(c)   Whether Defendants were members of, or participants in the conspiracy alleged herein;

(d)   Whether Defendants engaged in a pattern or practice of racketeering, as alleged herein;

(e)   Whether documents and statements provided to Plaintiffs and members of the Class omitted material facts;

(f)   Whether Plaintiffs and members of the class sustained damages, and if so, the appropriate measure of damages; and

(g)   Whether Plaintiffs and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

91.   In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

(a)   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants;

(b)   The prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a

1    practical matter, be dispositive of the interests of the other members of

2    the Class not parties to the adjudications, or substantially impair or

3    impede their ability to protect their interests; and

4        (c)    Defendants have acted or refused to act on grounds generally

5    applicable to the Class, thereby making appropriate final injunctive

6    relief or corresponding declaratory relief with respect to the Class as a

7    whole and necessitating that any such relief be extended to members of

8    the Class on a mandatory, class-wide basis.

9    92.    Plaintiffs are not aware of any difficulty which will be encountered in the

10   management of this litigation which should preclude its maintenance as a class action

11   ## FIRST CAUSE OF ACTION

12   ### Violations of the Racketeer Influenced and Corrupt Organizations Act
13   (18 U.S.C. § 1962(c))

14   93.    Plaintiffs incorporate by reference in this cause of action each and every

15   allegation of the preceding paragraphs, with the same force and effect as though fully set

16   forth herein.

17   94.    Plaintiffs bring this cause of action on behalf of themselves and the members

18   of the Class.

19   ## THE ENTERPRISE

20   95.    Defendants Citibank, N.A., and CitiMortgage, Inc. are each persons within

21   the meaning of Title 18 United States Code section 1961(3).

22   96.    At all relevant times, in violation of Title 18 United States Code section

23   1962(c), Citibank, N.A., CitiMortgage, Inc., including their directors, employees, and

24   agents, along with their "property preservation" vendors – including Safeguard Real

25   Estate Properties, LLC d/b/a of Safeguard Properties, LLC – and the real estate brokers

26   who provide BPOs for Citi, conducted the affairs of an association-in-fact enterprise, as

27   that term is defined in Title 18 United States Code section 1961(4) (the "Citi Enterprise").

28   The affairs of this enterprise affected interstate commerce through a pattern of

22

1 | racketeering activity

2 |     97.    The Citi Enterprise is an ongoing, continuing group or unit of persons and
3 | entities associated together for the common purpose of limiting costs and maximizing
4 | profits by fraudulently concealing assessments for unlawfully marked-up and/or
5 | unnecessary third party fees for default-related services on borrowers' accounts.

6 |     98.    While the members of the Citi Enterprise participate in and are part of the
7 | enterprise, they also have an existence separate and distinct from the enterprise. The Citi
8 | Enterprise has a systematic linkage because there are contractual relationships,
9 | agreements, financial ties, and coordination of activities between Defendants, the real
10 | estate brokers who perform BPOs, and the vendors that perform property inspections.

11 |     99.    Operating the Citi Enterprise according to policies and procedures developed
12 | and established by their executives, Citibank, N.A., and CitiMortgage, Inc. control and
13 | direct the affairs of the Citi Enterprise and use the other members of the Citi Enterprise as
14 | instrumentalities to carry out Citi's fraudulent scheme. These policies and procedures
15 | established by Citi's executives include providing statements that fail to disclose the true
16 | nature of the marked-up or unnecessary fees, cryptically identifying default-related
17 | service fees as "Delinquency Expenses," using mortgage loan management software
18 | designed to increase the fees assessed on borrowers' accounts, without consideration for
19 | whether the assessment of such fees is necessary under the circumstances, failing to
20 | provide borrowers with documentation to support assessments of fees for BPOs, and
21 | directing property preservation vendors to conduct services without consideration for
22 | whether they are necessary.

23
24
25
26
27
28

1

## THE PREDICATE ACTS

2      100.   Defendants' systematic schemes to fraudulently conceal assessments of

3  unlawfully marked-up or unnecessary third party fees on the accounts of borrowers who

4  have mortgage loans administered by CitiMortage, Inc., as described above, was

5  facilitated by the use of the United States Mail and wire. Defendants' schemes constitute

6  "racketeering activity" within the meaning of Title 18 United States Code section 1961(1),

7  as acts of mail and wire fraud, under Title 18 United States Code sections 1341 and 1343.

8      101.   In violation of Title 18 United States Code sections 1341 and 1343,

9  Defendants utilized the mail and wire in furtherance of their scheme to defraud borrowers

10  whose loans are serviced by CitiMortgage by obtaining money from borrowers using false

11  or fraudulent pretenses.

12      102.   Through the mail and wire, the Defendants provided mortgage invoices, loan

13  statements, payoff demands, or proofs of claims to borrowers, demanding that borrowers

14  pay fraudulently concealed marked-up or unnecessary fees for default-related services,

15  such as BPOs or property inspections. Defendants also accepted payments and engaged

16  in other correspondence in furtherance of their scheme through the mail and wire.

17      103.   Defendants fraudulently and unlawfully marked-up fees in violation of

18  borrowers' mortgage agreements because the fees exceed the actual cost of the services,

19  and therefore, they violate the disclosures made to borrowers.

20      104.   The mortgage invoices, loan statements, or proofs of claims provided to

21  borrowers fraudulently concealed the true nature of assessments made on borrowers'

22  accounts. Using false pretenses, identifying the fees on mortgage invoices, loan

23  statements, or proofs of claims only as "Delinquency Expenses" to obtain full payments

24  from borrowers, Defendants disguised the true nature of these fees and omitted the fact

25  that the fees include undisclosed mark-ups or were unnecessary. By omitting and

26  fraudulently concealing the true nature of amounts purportedly owed in communications

27  to borrowers, Defendants made false statements using the Internet, telephone, facsimile,

28  United States mail, and other interstate commercial carriers.

1    105.   Furthermore, to lull borrowers into a sense of trust, conceal Defendants'
2  unlawful fees, and dissuade borrowers from challenging Defendants' unlawful fee
3  assessments, Defendants further conceal their scheme from borrowers by telling them, in
4  statements and other documents, that "Delinquency expenses are third-party expenses
5  such as property inspection fees, property preservation costs, appraisal costs, and attorney
6  fees incurred by CMI as a result of default," without disclosing that such fees may contain
7  mark-ups, and by merely giving a list of potential types of fees without a true itemization,
8  leaving borrowers unable to know the true nature of the fees that are assessed under the
9  "Delinquency Expenses" description.

10    106.   Defendants' omissions were material to Plaintiffs and the members of the
11  Class.  Had Defendants disclosed the true marked-up or unnecessary nature of the fees for
12  default-related services, Plaintiffs would have been aware and would have challenged
13  Defendants' unlawful fee assessments or they would not have paid them.

14    107.   Each of these acts constituted an act of mail fraud for purposes of Title 18
15  United States Code section 1341.

16    108.   Additionally, using the Internet, telephone, and facsimile transmissions to
17  fraudulently communicate false information about these fees to borrowers, to pursue and
18  achieve their fraudulent scheme, Defendants engaged in repeated acts of wire fraud in
19  violation of Title 18 United States Code section 1343.

20    109.   In an effort to pursue their fraudulent scheme, Defendants knowingly
21  fraudulently concealed or omitted material information from Plaintiffs and members of
22  the Class.  Defendants' knowledge that their activities were fraudulent and unlawful is
23  evidenced by, among other things, the fact that they did not disclose the mark-ups or
24  unnecessary nature of the fees in their communications to borrowers.

25    110.   The predicate acts specified above constitute a "pattern of racketeering
26  activity" within the meaning of Title 18 United States Code section 1961(5) in which
27  Defendants have engaged under Title 18 United States Code section 1962(c).

28    111.   All of the predicate acts of racketeering activity described herein are part of

the nexus of the affairs and functions of the Citi Enterprise racketeering enterprise.  The racketeering acts committed by the Citi Enterprise employed a similar method, were related, with a similar purpose, and they involved similar participants, with a similar impact on the members of the Class.  Because this case is brought on behalf of a class of similarly situated borrowers and there are numerous acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiffs to plead all of the details of the scheme with particularity.  Plaintiffs cannot plead the precise dates of all of Defendants' uses of the mail and wire because this information cannot be alleged without access to Defendants' records.

112.   The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

113.   Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

114.   As a direct and proximate result of these violations of Title 18 United States Code sections 1962(c) and (d), Plaintiffs and members of the class have suffered substantial damages.  Defendants are liable to Plaintiffs and members of the Class for treble damages, together with all costs of this action, plus reasonable attorney's fees, as provided under Title 18 United States Code section 1964(c).

## SECOND CAUSE OF ACTION

**Violation of the Racketeer Influenced and Corrupt Organizations Act,
Conspiracy to Violate Title 18 United States Code section 1962(c)
(18 U.S.C. § 1962(d))**

115.   Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

116.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

117.   As set forth above, in violation of Title 18 United States Code section

1962(d), defendants Citibank, N.A., and CitiMortgage, Inc. conspired to violate the provisions of Title 18 United States Code section 1962(c).

118.   As set forth above, Defendants, having directed and controlled the affairs of the Citi Enterprise, were aware of the nature and scope of the enterprise's unlawful scheme, and they agreed to participate in it.

119.   As a direct and proximate result, Plaintiffs and the members of the Class have been injured in their business or property by the predicate acts which make up Defendants' patterns of racketeering activity in that unlawfully marked-up and/or unnecessary fees for default-related services were assessed on their mortgage accounts.

## THIRD CAUSE OF ACTION

### Unjust Enrichment

120.   Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

121.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

122.   By their wrongful acts and omissions of material facts, Defendants were unjustly enriched at the expense of Plaintiffs and members of the Class.

123.   The mortgage contract with borrowers like Plaintiffs and the members of the Class discloses that Defendants will pay for default-related services when necessary, and they will be reimbursed by the borrower. Nowhere in the mortgage contract is it disclosed that Defendants may mark-up the actual cost of those services to make a profit, or that Defendants may incur unnecessary third party fees.

124.   Nevertheless, Defendants mark-up the prices charged by vendors, often by 100% or more, and then, without disclosing the mark-up, assess borrowers' accounts for the higher, marked-up fee so that Defendants can earn a profit. Additionally, as a policy, Defendants assess such fees on borrowers' accounts without adequate concern for whether they are necessary.

1      125.  Thus, Plaintiffs and members of the Class were unjustly deprived.

2      126.  Defendants are aware that it is improper to mark-up or assess unnecessary
3   third party fees on borrowers' accounts for default-related services. Therefore,
4   Defendants fraudulently conceal these fees on borrowers' accounts, omitting any
5   information about Defendants' additional profits, by identifying them on mortgage
6   statements only as "Delinquency Expenses."

7      127.  Furthermore, to lull borrowers into a sense of trust, conceal Defendants'
8   unlawful fees, and dissuade borrowers from challenging Defendants' unlawful fee
9   assessments, Defendants further conceal their scheme from borrowers by telling them, in
10  statements and other documents, that such fees are "Delinquency expenses are third-party
11  expenses such as property inspection fees, property preservation costs, appraisal costs,
12  and attorney fees incurred by CMI as a result of default," without disclosing that such fees
13  may contain mark-ups, and by merely giving a list of potential types of fees without a true
14  itemization, leaving borrowers unable to know the true nature of the fees that are assessed
15  under the "Delinquency Expenses" description.

16     128.  It would be inequitable and unconscionable for Defendants to retain the
17  profit, benefit and other compensation they obtained from their fraudulent, deceptive, and
18  misleading conduct alleged herein.

19     129.  Plaintiffs and members of the Class seek restitution from Defendants, and
20  seek an order of this Court disgorging all profits, benefits, and other compensation
21  obtained by Defendants from their wrongful conduct.

22                          **FOURTH CAUSE OF ACTION**

23                                   **Fraud**

24     130.  Plaintiffs incorporate by reference in this cause of action each and every
25  allegation of the preceding paragraphs, with the same force and effect as though fully set
26  forth herein. Plaintiffs bring this cause of action on behalf of themselves and the
27  members of the Class.

28     131.  Defendants concealed and suppressed material facts, namely, the fact that

28

1  Defendants mark-up the prices charged by vendors, often by 100% or more, and then,
2  without disclosing the mark-up, assess borrowers' accounts for the higher, marked-up fee
3  so that Defendants can earn a profit. In truth and in fact, borrowers are not obligated to
4  pay the amounts that have been specified in Defendants' communications for default-
5  related services, such as BPOs. Contrary to Defendants' communications, Defendants are
6  not legally authorized to assess and collect these fees.

7      132. Defendants omit a true itemization that identifies the nature of each fee, and
8  they fail to disclose the nature of the charges and fees assessed. Defendants conceal the
9  fact the category identified as "Delinquency Expenses" reflects marked-up and/or
10 unnecessary fees that were never incurred by Defendants.

11     133. Plaintiffs relied their reasonable expectation that Defendants comply with the
12 disclosures set forth in the mortgage agreement, Notes, and Security Instruments, and as a
13 result, Plaintiffs relied on Defendants' disclosures about the fees on their statements,
14 reasonably believing the "Delinquency Expenses" to be valid charges that were not
15 unlawfully marked-up or unnecessary.

16     134. Indeed, to lull borrowers into a sense of trust and dissuade them from
17 challenging Defendants' unlawful fee assessments, Defendants further conceal their
18 scheme by telling borrowers, in statements and other documents, that such fees are
19 "Delinquency expenses are third-party expenses such as property inspection fees, property
20 preservation costs, appraisal costs, and attorney fees incurred by CMI as a result of
21 default," without disclosing that such fees may contain mark-ups, and by merely giving a
22 list of potential types of fees without an itemization, leaving borrowers unable to know the
23 true nature of the fees that are assessed under the "Delinquency Expenses" description.

24     135. Had the true nature of the fees been disclosed to Plaintiffs and members of
25 the Class, they would have been aware of the mark-ups, or unnecessary nature of the fees,
26 and Plaintiffs would have disputed the charges and not paid them

27     136. Defendants knew their concealment and suppression of materials facts was
28 false, misleading, and in violation of the disclosures made to borrowers because the fees

29

1 | exceed the actual cost of the services.

2 | 137. As a result of Defendants' fraudulent omissions and failures to disclose,
3 | Plaintiffs and members of the Class have been injured in fact and suffered a loss of money
4 | or property. Plaintiffs and members of the Class would not have paid Defendants'
5 | fraudulently marked-up fees or they would have challenged the assessment of such fees
6 | on their accounts had it not been for Defendants' concealment of material facts.

7 | 138. Defendants omitted and concealed material facts, as discussed above ,with
8 | knowledge of the effect of concealing of these material facts. Defendants knew that by
9 | misleading consumers, they would generate higher profits.

10 | 139. Plaintiffs and members of the Class justifiably relied upon Defendants'
11 | knowing, affirmative, and active concealment. By concealing material information about
12 | their scheme to assess undisclosed marked-up fees on borrowers' accounts, Defendants
13 | intended to induce Plaintiffs and members of the Class into believing that they owed
14 | Defendants money that Defendants were not actually entitled.

15 | 140. Defendants acted with malice, oppression, or fraud.

16 | 141. As a direct and proximate result of Defendants' omissions and active
17 | concealment of material facts, Plaintiffs and each member of the Class has been damaged
18 | in an amount according to proof at trial.

19 | **PRAYER FOR RELIEF**

20 | Plaintiffs, and on behalf of themselves and all others similarly situated, request the
21 | Court to enter judgment against Defendants, as follows:

22 | 1. Certifying the Class, as requested herein, certifying Plaintiffs as the
23 | representatives of the Class, and appointing Plaintiffs' counsel as counsel for the Class;

24 | 2. Ordering that Defendants are financially responsible for notifying all
25 | members of the Class of the alleged omissions discussed herein;

26 | 3. Awarding Plaintiffs and the members of the Class compensatory damages in
27 | an amount according to proof at trial;

28 | 4. Awarding restitution and disgorgement of Defendants' revenues or profits to

1 | Plaintiffs and members of the Class;

2 |     5.    Awarding Plaintiffs and the members of the Class treble damages in an

3 | amount according to proof at trial;

4 |     6.    Awarding declaratory and injunctive relief as permitted by law or equity,

5 | including: enjoining Defendants from continuing the unlawful practices as set forth

6 | herein, and directing Defendants to identify, with Court supervision, victims of its conduct

7 | and pay them restitution and disgorgement of all monies acquired by Defendants by

8 | means of any act or practice declared by this Court to be wrongful;

9 |     7.    Ordering Defendants to engage in corrective advertising;

10 |     8.    Awarding interest on the monies wrongfully obtained from the date of

11 | collection through the date of entry of judgment in this action;

12 |     9.    Awarding attorneys' fees, expenses, and recoverable costs reasonably

13 | incurred in connection with the commencement and prosecution of this action; and

14 |     10.    For such other and further relief as the Court deems just and proper.

15

16 | Dated: July **24**, 2012                     BARON & BUDD, P.C.

17

18 |                                    By:
                                      Mark Pifko

19 |                                  Daniel Alberstone (SBN 105275)

20 |                                  Roland Tellis (SBN 186269)
                                 Mark Pifko (SBN 228412)

21 |                                  BARON & BUDD, P.C.
                                 15910 Ventura Boulevard, Suite 1600

22 |                                  Encino, California 91436
                                 Telephone: (818) 839-2333

23 |                                  Facsimile: (818) 986-9698

24 |                                  Attorneys for Plaintiffs
                                 GLORIA STITT, RONALD STITT, JUDI

25 |                                  SHATZER, MARK ZIRLOTT, and TERRI
                                 LOUISE ZIRLOTT, individually, and on

26 |                                  behalf of other members of the public
                                 similarly situated

27

28

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial of their claims by jury to the extent authorized by law.

Dated: July 24, 2012                    BARON & BUDD, P.C.

By: _____
      Mark Pifko

Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Mark Pifko (SBN 228412)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: (818) 839-2333
Facsimile: (818) 986-9698

Attorneys for Plaintiffs
GLORIA STITT, RONALD STITT, JUDI
SHATZER, MARK ZIRLOTT, and TERRI
LOUISE ZIRLOTT, individually, and on
behalf of other members of the public
similarly situated

32