1  Daniel Alberstone (SBN 105275)
   dalberstone@baronbudd.com
2  Roland Tellis (SBN 186269)
   rtellis@baronbudd.com
3  Mark Pifko (SBN 228412)
   mpifko@baronbudd.com
4  Isaac Miller (SBN 266459)
   imiller@baronbudd.com
5  BARON & BUDD, P.C.
   15910 Ventura Boulevard, Suite 1600
6  Encino, California 91436
   Telephone: (818) 839-2333
7  Facsimile:  (818) 986-9698

8  Attorneys for Plaintiffs
9  GLORIA STITT, RONALD STITT, JUDI
   SHATZER, MARK ZIRLOTT, and TERRI
10 LOUISE ZIRLOTT, individually, and on
   behalf of other members of the public
11 similarly situated

12                 UNITED STATES DISTRICT COURT

13               NORTHERN DISTRICT OF CALIFORNIA

14                        OAKLAND DIVISION

15

16 GLORIA STITT, RONALD STITT, JUDI        Case Number: 4:12-cv-3892-YGR
   SHATZER, MARK ZIRLOTT, and
17 TERRI LOUISE ZIRLOTT, individually,    **CLASS ACTION**
   and on behalf of other members of the
18 general public similarly situated,      **FIRST AMENDED COMPLAINT**

19                    Plaintiffs,          (1)  Violations of the Racketeer
20                                              Influenced and Corrupt
            vs.                                 Organizations Act (18 U.S.C. §
21                                              1962(c))
   CITIBANK, N.A., a national association,
22 and CITIMORTGAGE, INC., a New York     (2)  Violations of the Racketeer
   corporation,                                Influenced and Corrupt
23                                              Organizations Act (18 U.S.C. §
                     Defendants.                1962(d));
24
                                           (3)  Unjust Enrichment; and
25
                                           (4)  Fraud
26

27                                         **Jury Trial Demanded**

28

1    For their First Amended Complaint ("FAC") against Citibank, N.A., and

2    CitiMortgage, Inc. (collectively "Defendants"), Plaintiffs Gloria Stitt, Ronald Stitt, Judi

3    Shatzer, Mark Zirlott, and Terri Louise Zirlott ("Plaintiffs"), individually, and on behalf

4    of all other members of the public similarly situated, based on information and belief,

5    allege as follows:

6    <u>**NATURE OF THE ACTION**</u>

7    1.    Plaintiffs' claims against Defendants in this action were originally brought as

8    part of the action captioned as *Bias et al. v. Wells Fargo & Company et al.*, case no. 4:12-

9    cv-00664-YGR (N.D. Cal., filed Feb. 10, 2012).  However, by Order dated July 13, 2012,

10   this Court, the Honorable Yvonne Gonzalez Rogers presiding, found, on the Court's own

11   motion, that the claims with respect to the Defendants in this action were not properly

12   joined in a single action with the claims against the other defendants in the *Bias* action.

13   As a result, the Court ordered Plaintiffs "to re-file their claims against [Defendants as an]

14   additional, separate action."[1]  Accordingly, consistent with the Court's order, Plaintiffs

15   hereby bring this separate action against Citibank, N.A., and CitiMortgage, Inc.

16   2.    This case concerns fraudulent practices committed by Defendants in

17   connection with their home mortgage loan servicing businesses.  Taking advantage of

18   economic downturn and the increasing number of loans in default, Defendants formed an

19   enterprise to service these loans according to uniform practices designed to maximize fees

20   assessed on borrowers' accounts when they are behind on their payments.  Consistent

21   with these practices, Defendants use automated mortgage loan management systems,

22   made up of an enterprise of subsidiaries, inter-company departments, divisions, and third-

23   party "property preservation" vendors, to engage in a scheme to conceal the unlawful

24   assessment of unnecessary third party fees for default-related services, cheating borrowers

25

26   ---
     [1] *See Bias et al. v. Wells Fargo & Company et al.*, N.D. Cal., case no. 4:12-cv-00664-YGR, *Order

27   Granting in Part and Denying in Part Motion of Defendants Wells Fargo & Company and Wells Fargo
     Bank, N.A. to Sever and Transfer, and Severing Claims as to Other Defendants on the Court's Own

28   Motion*, July 13, 2012 (Dkt. No. 59).

1    who can least afford it.

2        3.    More specifically, when home mortgage borrowers get behind on their

3    payments and go into "default," Defendants assess fees on borrowers' accounts for

4    various default-related services, typically performed by third parties, purportedly designed

5    to protect the lender's interest in the property.  However, Defendants are not permitted to

6    assess borrowers' accounts for default-related service fees that are unnecessary.

7    Nevertheless, as discussed in detail below, using false pretenses to conceal the truth from

8    borrowers, that is precisely what Defendants do.

9        4.    Defendants formed enterprises, associations of subsidiaries, affiliated

10   companies, and "property preservation" vendors, and designed schemes to disguise

11   hidden, unnecessary fees so as to avoid charging the lenders and/or investors for whom

12   they service loans or absorbing the costs of these fees themselves.  Employing this

13   strategy, Defendants are able to  avoid the costs of these default-related service fees at the

14   expense of struggling consumers.

15       5.    Many borrowers reasonably believe the lender from whom they obtained

16   their mortgage will hold and service their loan until it is paid off.  Instead, however,

17   through relatively recent mortgage industry practices, such as securitization and the sale

18   of mortgage backed securities, that is often not the case.  In today's market, loans and the

19   rights to service them are bought and sold at will, multiple times over.

20       6.    A borrower's relationship is typically with the mortgage servicer rather than

21   the lender who originated the loan.  CitiMortgage, Inc. is one of the largest mortgage

22   servicers in the United States.  As a mortgage servicer, CitiMortgage, Inc. is responsible

23   for the day-to-day management of loan accounts, including handling customer inquiries,

24   collecting and crediting loan payments, sending default notices to delinquent borrowers,

25   negotiating loan modifications, and directing foreclosure activities, including engaging the

26   services of foreclosure counsel, even if the foreclosure is brought in the name of the

27   owner of the loan, rather than the servicer.

28       7.    Borrowers depend on their mortgage servicers to handle servicing-related

2

Case No.: 4:12-cv-03892-YGR

FIRST AMENDED COMPLAINT

tasks accurately and with skill.  Because financial institutions like Citibank, N.A. who generate loan servicing revenue through operating subsidiaries like CitiMortgage, Inc., do not profit directly from interest payments made by borrowers, rather than ensuring that borrowers stay current on their loans, Defendants are more concerned with generating revenue from fees assessed against the mortgage accounts they service and from the lenders and/or investors for whom they service loans.  According to one member of the Board of Governors of the Federal Reserve System, "a foreclosure almost always costs the investor [who owns the loan] money, but [it] may actually earn money for the servicer in the form of fees."[2]

8.    Financial institutions like Defendants see opportunity where investors see failure because borrowers are captives to companies who service their loans. Accordingly, when borrowers go into default and Defendants unilaterally decide to instruct third parties to perform default-related services, borrowers have no option but to accept Defendants' choice of providers.

9.    Taking advantage of these circumstances, the Defendants formed an enterprise with their respective subsidiaries, affiliates, and "property preservation" vendors, and then, developed a uniform practice of unlawfully assessing fees for unnecessary property inspections and BPOs against borrowers' accounts  rather than against the accounts of the lender and/or investors for whom they service these accounts or absorbing the costs themselves.

10.   Defendants are aware that it is improper to assess fees on borrowers' accounts for unnecessary property inspections and BPOs.  Therefore, Defendants fraudulently conceal these fees on borrowers' accounts by identifying them with cryptic descriptions, such as "Delinquency Expenses."

---

[2] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov. 12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Jan. 23, 2012).

11.     Indeed, Defendants' practices are designed to avoid detection even when examined in bankruptcy proceedings.  As one court has explained, "[l]enders have apparently been operating under the assumption that the fees and costs in their proofs of claim are invulnerable to challenge because debtors lack the sophistication, the debtors' bar lacks the financial motivation, and bankruptcy courts lack the time."[3]  "[T]he Court believes that certain members of the mortgage industry are *intentionally* attempting to game the system by requesting undocumented and potentially excessive fees."[4]

12.     The rampant abuses by mortgage servicers have led federal regulators to enter into numerous Consent Orders, but according to Mark Pearce, Director, Division of Depositor and Consumer Protection, Federal Deposit Insurance Corporation, "these consent orders do not fully identify and remedy past errors in mortgage-servicing operations of large institutions; in fact, the scope of the interagency review did not include a review of . . . the fees charged in the servicing process.  Much work remains to identify and correct past errors and to ensure that the servicing process functions effectively, efficiently, and fairly going forward."[5]  Moreover, the Consent Orders do not reach the type of conduct at issue here.

13.     Plaintiffs bring this action, seeking injunctive relief and damages on behalf of themselves and the thousands of borrowers who have been victimized by the Defendants' uniform schemes.

---

[3] *In re: Prevo*, 394 B.R. 847, 848 (Bankr. S.D. Tex. 2008).

[4] *Id*. at 851 (emphasis added).

[5] *See* Mark Pearce, Director, Division of Depositor and Consumer Protection, Federal Deposit Insurance Corporation, *Mortgage Servicing:  An Examination of the Role of Federal Regulators in Settlement Negotiations and the Future of Mortgage Servicing Standards*, before the Subcommittees on Financial Institutions and Consumer Credit, and Oversight and Investigations Committee on Financial Services, U.S. House of Representatives, July 7, 2011, available at http://financialservices.house.gov/UploadedFiles/070711pearce.pdf (last visited, Feb. 1, 2012).

Case No.: 4:12-cv-03892-YGR

FIRST AMENDED COMPLAINT

## JURISDICTION AND VENUE

14.   Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the class of plaintiffs are citizens of states different from Defendants.  Further, greater than two-thirds of the members of the Class reside in states other than the states in which Defendants are a citizens.

15.   This Court also has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1961, 1962 and 1964.  This Court has personal jurisdiction over Defendants under 18 U.S.C. §1965.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding.

16.   Venue lies within this judicial district under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendants' contacts are sufficient to subject them to personal jurisdiction in this District, and therefore, Defendants reside in this District for purposes of venue, or under 28 U.S.C. § 1391(b)(2) because certain acts giving rise to the claims at issue in this FAC occurred, among other places, in this District.

### Intradistrict Assignment

17.   Consistent with Northern District of California Civil Local Rule 3-5(b), assignment to the San Francisco or Oakland Division is appropriate under Civil Local Rules 3-2(c) and 3-2(d), because acts giving rise to the claims at issue in this FAC occurred, among other places, in this District, in the San Francisco and Oakland.

## PARTIES

18.   Plaintiff Gloria Stitt is an individual and a citizen of New York.

19.   Plaintiff Ronald Stitt is an individual and a citizen of New York.

20.    Plaintiff Judi Shatzer is an individual and a citizen of Maryland.

21.    Plaintiff Mark Zirlott is an individual and a citizen of Alabama.

22.    Plaintiff Terri Louise Zirlott is an individual and a citizen of Alabama.

23.    Defendant Citibank, N.A. is a national bank organized and existing as a national association under the National Bank Act, 12 U.S.C. §§ 21 *et seq*., with its principal place of business in New York, New York, and is a subsidiary of Citicorp, and is the parent corporation of CitiMortgage, Inc.

24.    Defendant CitiMortgage, Inc. is a subsidiary of Citibank, N.A., and is a New York corporation, with its principal place of business in O'Fallon, Missouri.

25.    CitiMortgage, Inc. is the fourth-largest servicer in the United States. CitiMortgage, Inc. services approximately 4 million loans, and approximately 20% of those loans concern properties in California.

26.    Whenever, in this FAC, reference is made to any act, deed, or conduct of Defendants committed in connection with the enterprise, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

27.    Plaintiffs are informed and believe, and based thereon, allege that, at all material times herein, each Citi defendant, Citibank, N.A. and CitiMortgage, Inc. (collectively, "Citi"), was the agent, servant, or employee of, and acted within the purpose, scope, and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other Citi defendant, and ratified and approved the acts of the other Citi defendant.

28.    Citibank, N.A. exercises specific and financial control over the operations of CitiMortgage, Inc., and it dictates the policies and practices of CitiMortgage, Inc. Citibank, N.A. also exercises power and control over the specific activities at issue in this lawsuit, and it is the ultimate recipient of the ill-gotten gains described herein.  Citigroup,

Inc., the parent company of both Citibank, N.A. and CitiMortgage, Inc., represents that it brings "the power of one Citi to our Citi Smith Barney, Citibank, CitiMortgage, Citi Cards, and Student Loan clients" by "Serving clients as one company."[6]  The fraudulent scheme at issue in this case was organized by executives working at the highest levels of Citibank, N.A. and CitiMortgage, Inc., and carried out by both executives and subordinate employees.

## FACTUAL BACKGROUND

29.     America's lending industry is in turmoil, and the lending community has divorced itself from the borrowers it once served.  Traditionally, when people wanted to borrow money, they went to a bank or a "savings and loan."  Banks loaned money and borrowers promised to repay the bank, with interest, over a specific period of time.  The originating bank kept the loan on its balance sheet, and serviced the loan -- processing payments, and sending out applicable notices and other information -- until the loan was repaid.  The originating bank had a financial interest in ensuring that the borrower was able to repay the loan.

30.     Today, however, the process has changed.  Mortgages are now packaged, bundled, and sold to investors on Wall Street through what is referred to in the financial industry as mortgage backed securities or MBS.  This process is called securitization. Securitization of mortgage loans provides financial institutions like Defendants with the benefit of immediately being able to recover the amounts loaned.  Securitization essentially eliminates the bank's risk from potential default.  But, by eliminating the risk of default, mortgage backed securities have disassociated the lending community from borrowers.  Numerous unexpected consequences have resulted from the divide between lenders and borrowers.

31.     Among other things, securitization has created an industry of companies in

---

[6] *See* Citigroup, Inc. 2006 Annual Report, available at http://www.citigroup.com/citi/investor/quarterly/2007/ar06c_en.pdf?ieNocache=809 (last visited July 23, 2012).

1   the lending industry like Defendants, who no longer make money primarily from interest

2   on the loans they originate.  Thus, lenders no longer have the financial interest in the

3   repayment of loans that they once did.  Instead, financial institutions like Defendants,

4   through their network of subsidiaries, operating entities and divisions, service or

5   administer mortgages for hedge funds and investment houses who own the loans.  Rather

6   than earn income from the interest on these loans, financial institutions like Defendants

7   are paid a fee for their loan administration services.

8        32.    Additionally, under agreements with investors (pooling and service

9   agreements), loan servicers like Defendant CitiMortgage, Inc. assess fees on borrowers'

10  accounts for default-related services in connection with their administration of borrowers'

11  loans.  These fees include Broker's Price Opinion fees, appraisal fees, and property

12  inspection fees.  Defendants' collection of these unnecessary fees, however, exemplifies

13  how America's lending industry has run off the rails.

14       33.    As one Member of the Board of Governors of the Federal Reserve System

15  has explained, "[w]hile an investor's financial interests are tied more or less directly to the

16  performance of a loan, the interests of a third-party servicer are tied to it only indirectly, at

17  best.  The servicer makes money, to oversimplify it a bit, by maximizing fees earned and

18  minimizing expenses while performing the actions spelled out in its contract with the

19  investor. . . . The broad grant of delegated authority that servicers enjoy under pooling

20  and servicing agreements (PSAs), combined with an effective lack of choice on the part of

21  consumers, creates an environment ripe for abuse."[7]

22       34.    For financial institutions like Defendants, who are determined to maximize

23  the money they earn for servicing loans, the right to charge servicing fees has opened the

24  door to a world of exploitation.  As a result of the disassociation between loan servicers

25

26  ――――――――――――――――
    [7] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the*
27  *National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov.
    12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Jan.
28  23, 2012).

and the monies generated from the interest borrowers pay on their loans, Defendants have been incentivized to find other ways to grow their profits.

35.     Defendants, with their subsidiaries, affiliated companies, intercompany divisions, and third-party "property preservation" vendors, formed an unlawful enterprise and decided to game the system.

36.     In short, as explained by Adam J. Levitin, Associate Professor of Law at the Georgetown University Law Center, in testimony to the United States House Financial Services Committee, Subcommittee on Housing and Community Opportunity, "Servicers' business model also encourages them to cut costs wherever possible, even if this involves cutting corners on legal requirements, and to lard (sic) on junk fees and in-sourced expenses at inflated prices."[8]

## DEFENDANTS' AUTOMATED LOAN SERVICING PRACTICES

37.     To maximize profits, Defendants assign the complex task of administering these millions of loans to computer software programs.  The software programs are designed to manage borrowers' accounts and assess fees, according to protocols and policies designed by the executives at Citibank, N.A. and its operating subsidiary, CitiMortgage, Inc.

38.     Citi automates its loan servicing business primarily through two computer software programs, which are called CitiLink and Maestro.  CitiLink and Maestro are proprietary to Citi.  Citi also uses a program called DRI, which is a case management, communications, and recordkeeping software system for default-related matters.

39.     CitiLink and Maestro contain information relating to the origination, payment, interest, and fees concerning mortgages serviced by CitiMortgage, Inc. Management of payment information for loans serviced by Citi is automated by CitiLink

---

[8] *See* Adam J. Levitin, *Robo-Singing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing,* before the House Financial Services Committee, Subcommittee on Housing and Community Opportunity, Nov. 18, 2010, available at
http://financialservices.house.gov/Media/file/hearings/111/Levitin111810.pdf (last visited Feb. 1, 2012).

and Maestro.  When borrowers send payment checks to Citi, the payments are automatically loaded into CitiLink or Maestro.  Payments made over the phone or on the Internet are automatically fed into CitiLink or Maestro as well.

40.    Based on parameters inputted into these programs, Citi's computer systems automatically implement decisions about how to manage borrowers' accounts based on internal software logic.  Among other things, if a loan in Citi's systems is past due, the internal software logic in CitiLink and Citi's other loan management programs is designed to automatically assess late fees, default-related service fees, and other charges against borrowers' accounts.

### UNNECESSARY THIRD PARTY FEES
### FOR DEFAULT-RELATED SERVICES

41.    Rather than being motivated by a specific concern that a lender's interest in a property is at risk, Citi's system is programmed to order property inspections and BPOs at intervals demanded by private investors and the various government-sponsored enterprises ("GSEs") that owned the mortgages serviced by Citi.  Of course, Citi has enormous incentives to do whatever is demanded by these investors as it earns billions of dollars in servicing fees from them.

42.    However, irrespective of whether Citi is acting at the direction of these investors, it is the uniform mortgage note instrument executed by the borrowers (rather than just Citi's agreements with investors and GSEs) that supplies the purported legal justification for Citi's authority to bill borrowers for these inspections and BPOs, and these notes *do not* permit the indiscriminate ordering and billing of property inspections and BPOs engaged in by Citi.  To the contrary, the mortgage notes provide that inspections and BPOs may be billed to borrowers only if they are necessary to protect the lender's interest in the property.

43.     The mortgage contract between a lender and a borrower generally consists of two documents:  the promissory note ("Note") and the mortgage or deed of trust ("Security Instrument").  The mortgage contacts serviced by Defendants are substantially similar because they conform to the standard Fannie Mae/Freddie Mac form contract. These contracts contain disclosures regarding what occurs if borrowers default on their loans.  The Security Instrument discloses to borrowers that, in the event of default, the loan servicer will:

> pay for whatever is reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, including protecting and/or assessing the value of the property, and securing and/or repairing the property.

44.     The Security Instrument further discloses that any such amounts disbursed by the servicer shall become additional debt of the borrower secured by the Security Instrument and shall bear interest at the Note rate from the date of disbursement.  The Note further discloses that the note holder:

> will have the right to be paid back by [the borrower] for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

Thus, the mortgage contract discloses to borrowers that the servicer will pay for default-related services when necessary, and will be reimbursed by the borrower.  It does not, however, permit such fees to be assessed on borrowers' accounts when they are unnecessary.

45.     In fact, GSEs like Fannie Mae expressly warned Citi not to charge borrowers' accounts for multiple default-related services unless the circumstances of the particular property require it.  However, based on the parameters implemented by Citi through it automated loan management system, Citi could never satisfy this condition.

46.     Defendant Citibank, N.A., its subsidiary, defendant CitiMortgage, Inc., and their property inspection and preservation vendor Safeguard Real Estate Properties, LLC d/b/a of Safeguard Properties, LLC ("Safeguard"), and the real estate brokers who provide

BPOs for Citi, including Corelogic, formed an enterprise and devised a scheme to defraud borrowers and obtain money from them by means of false pretenses.

47.    Plaintiffs are informed and believe, and on that basis, allege that using the enterprise and Citi's automated mortgage loan management system, Citi conceals unnecessary fees for default-related services on borrowers accounts, by identifying the charges only as "Delinquency Expenses" on borrowers' statements.  Under the this category of charges, Citi assesses fees for property inspections and BPOs on borrowers' accounts.

48.    Citi's automated loan management system is set up to order property inspections and BPOs and assess fees against borrowers when they are a certain number of days late on their mortgage, regardless of whether the assessment of such fees is necessary.  Although such inspections and BPOs purportedly are conducted to guard against property loss, Citi's practices are designed to ensure that these fees are charged to as many accounts as possible, even if the inspections and BPOs are unnecessary.

49.    Plaintiffs are informed and believe, and on that basis, allege that guidelines inputted into Citi's loan management software system automatically trigger property inspections if a loan is past due by a certain number of days, without regard to the condition of the property.  Plaintiffs are informed and believe, and on that basis, allege that after a borrower's account is past due by a set number of days, as inputted into the software, Citi's computer automatically generates a work order for a property inspection without human intervention.  Moreover, so long as a borrower's account is past due by the requisite number of days inputted into the loan management software, and without regard to the condition of the property, Citi's system automatically continues to order inspections, regardless of whether they are necessary.

50.    Plaintiffs are informed and believe, and on that basis, allege that even if the property inspections were properly performed and actually reviewed by someone at the bank, Citi's continuous assessment of fees for these inspections on borrowers accounts is still improper because of the frequency with which they are performed.  If the first

inspection report shows that the property is occupied and in good condition, it is unnecessary and inappropriate for Citi's system to automatically continue to order monthly inspections.  Nothing in the reports justifies continued monitoring.

51.   As a result of Citi's unlawful enterprise, hundreds of thousands of unsuspecting borrowers are cheated out of millions of dollars.

## BORROWERS SUFFER HARM
## AS A RESULT OF DEFENDANTS' PRACTICES

52.   In addition to the direct monetary damages caused to borrowers, in the form of additional, unlawful debts assessed on borrowers' accounts, borrowers suffer other, less obvious injuries as a result of the practices described herein.

53.   The assessment of these  fees can make it impossible for borrowers to become current on their loan.  Charges for default-related services can add hundreds or thousands of dollars to borrowers' loans over time, driving them further into default.

54.   When borrowers get behind on their mortgage, and fees for these default-related services are stacked on to the past-due principal and interest payments, Defendants' practices make it increasingly difficult for borrowers to ever bring their loan current.  Even if borrowers pay the delinquent principal and interest payments, the  fees for unnecessary default-related services ensure that borrowers stay in default.  After paying delinquent principal and interest, although the next payment comes in on time, often through automatic payment deductions from borrowers' bank accounts, part of the payment is applied to the fees first, so there is not enough to cover the entire monthly payment.  This makes that payment late, creating a cascade of more fees, and more arrears, that keeps borrowers in delinquency.  By the time borrowers are aware, Defendants are threatening to foreclose unless a huge payment is made, and the weight of these unnecessary fees drops borrowers into a financial abyss.

55.   As a result of Defendants' practices, which force borrowers to move deeper into default, borrowers suffer damage to their credit score.  Defendants provide information about borrowers' payment history to credit reporting companies, including

1   whether they have been late with a payment or missed any payments.  By keeping

2   borrowers in default with these practices, Defendants affect whether borrowers can get a

3   loan in the future – and what borrowers' interest rate will be on such loans.

4       56.   Additionally, as a result of Defendants' practices, which force borrowers to

5   move deeper into default, borrowers are driven into foreclosure.

6   **PLAINTIFFS' CLAIMS AGAINST CITI**

7       57.   Plaintiff Gloria Stitt is a resident of New York County, New York.

8       58.   Plaintiff Ronald Stitt is a resident of New York County, New York.

9       59.   Plaintiffs Gloria and Ronald Stitt have a mortgage serviced by CitiMortgage.

10       60.   Citi continually assessed fees for default-related services, including property

11   inspections, on the mortgage account of Plaintiffs Gloria and Ronald Stitt, as early as

12   April 19, 2010.  On mortgage statements provided to Plaintiffs Gloria and Ronald Stitt,

13   such fees were identified as "Delinquency Expenses."  Although some mortgage

14   statements stated, "Delinquency expenses are third-party expenses such as property

15   inspection fees, property preservation costs, appraisal costs, and attorneys fees incurred by

16   CMI as a result of default," Citi did not adequately disclose the true nature of the fees

17   assessed against the account of Plaintiffs Gloria and Ronald Stitt.  Mortgage statements

18   provided by Citi did not state exactly which of those categories of fees were assessed

19   against the account of Plaintiffs Gloria and Ronald Stitt, and they did not state if the fees

20   identified as "Delinquency Expenses" included more than one category of fee.

21   Additionally, by merely stating, "such as," and giving a list of potential types of fees, Citi

22   leaves borrowers unable to know if there are other categories of fees that are assessed

23   under the "Delinquency Expenses" description.

24       61.   Moreover, Citi failed to disclose that lenders and/or investors for whom they

25   service loans issued guidelines to Citi warning them not to charge borrowers with

26   unnecessary, repetitive fees.

27       62.   Defendants alone maintain a complete accounting of all fees assessed and

28   paid, and the details of each and every fee assessed and paid cannot be alleged with

complete precision without access to Defendants' records.  Nevertheless, Plaintiffs are informed and believe, and on that basis allege, that Plaintiffs Gloria and Ronald Stitt paid some or all of the unlawful fees assessed on their account.

63.     Plaintiff Shatzer is a resident of Carroll County, Maryland.

64.     Plaintiff Shatzer has a mortgage serviced by CitiMortgage.

65.     Citi continually assessed fees for default-related services, including property inspections, on the mortgage account of Plaintiff Shazter.  From January 2009 to February 2012, Citi assessed fees for more than 30 property inspections.  On mortgage statements provided to Plaintiff Shatzer, such fees were identified as "Delinquency Expenses." Although some mortgage statements stated, "Delinquency expenses are third-party expenses such as property inspection fees, property preservation costs, appraisal costs, and attorneys fees incurred by CMI as a result of default," Citi did not adequately disclose the true nature of the fees assessed against Plaintiff Shatzer's account.  Mortgage statements provided by Citi did not state exactly which of those categories of fees were assessed against Plaintiff Shatzer's account, and they did not state if the fees identified as "Delinquency Expenses" included more than one category of fee.  Additionally, by merely stating, "such as," and giving a list of potential types of fees, Citi leaves borrowers unable to know if there are other categories of fees that are assessed under the "Delinquency Expenses" description.

66.     Moreover, Citi failed to disclose that lenders and/or investors for whom they service loans issued guidelines to Citi warning them not to charge borrowers with unnecessary, repetitive fees.

67.     Defendants alone maintain a complete accounting of all fees assessed and paid, and the details of each and every fee assessed and paid cannot be alleged with complete precision without access to Defendants' records.  Nevertheless, Plaintiffs are informed and believe, and on that basis allege, that Plaintiff Shatzer paid some or all of the unlawful fees assessed on her account.

68.     Plaintiff Mark Zirlott is a resident of Mobile County, Alabama

1    69.    Plaintiff Terri Louise Zirlott is a resident of Mobile County, Alabama.

2    70.    Plaintiffs Mark and Terri Zirlott have a mortgage serviced by CitiMortgage.

3    71.    Citi continually assessed fees for default-related services, including property

4  inspections, on the mortgage account of Plaintiffs Mark and Terri Louise Zirlott, as early

5  as April 19, 2009.  From April 2009 to March 2010, Citi assessed fees for twelve property

6  inspections.  On mortgage statements provided to Plaintiffs Mark and Terri Louise Zirlott,

7  such fees were identified as "Delinquency Expenses."  Although some mortgage

8  statements stated, "Delinquency expenses are third-party expenses such as property

9  inspection fees, property preservation costs, appraisal costs, and attorneys fees incurred by

10  CMI as a result of default," Citi did not adequately disclose the true nature of the fees

11  assessed against the account of Plaintiffs Mark and Terri Louise Zirlott.  Mortgage

12  statements provided by Citi did not state exactly which of those categories of fees were

13  assessed against the account of Plaintiffs Mark and Terri Louise Zirlott, and they did not

14  state if the fees identified as "Delinquency Expenses" included more than one category of

15  fee.  Additionally, by merely stating, "such as," and giving a list of potential types of fees,

16  Citi leaves borrowers unable to know if there are other categories of fees that are assessed

17  under the "Delinquency Expenses" description.

18    72.    Moreover, Citi failed to disclose that lenders and/or investors for whom they

19  service loans issued guidelines to Citi warning them not to charge borrowers with

20  unnecessary, repetitive fees.

21    73.    Defendants alone maintain a complete accounting of all fees assessed and

22  paid, and the details of each and every fee assessed and paid cannot be alleged with

23  complete precision without access to Defendants' records.  Nevertheless, Plaintiffs are

24  informed and believe, and on that basis allege, that Plaintiffs Mark and Terri Louise

25  Zirlott paid some or all of the unlawful fees assessed on their account

26

27

28

**STATUTE OF LIMITATIONS**

74.     Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment, denial, and misleading actions, as alleged herein. Plaintiffs and members of the Class, as defined below, were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part.  Plaintiffs and members of the Class could not reasonably have discovered the true nature of the Defendants' scheme.

75.     Defendants are under a continuous duty to disclose to Plaintiffs and members of the classes the true character, quality, and nature of the fees they assess on borrowers' accounts.  Defendants knowingly, affirmatively, and actively concealed the true character, quality, and nature of their assessment of fees for unnecessary default-related services against borrowers' accounts, as well as the written guidelines under which Citi is obligated to operate and which prohibit the fees charged.  Plaintiffs and members of the Class reasonably relied upon Defendants' knowing, affirmative, and active concealment. Based on the foregoing, Defendants are estopped from relying on any statutes of limitation as a defense in this action.

76.     The causes of action alleged herein did or will only accrue upon discovery of the true nature of the charges assessed against borrowers' accounts, as a result of Defendants' fraudulent concealment of material facts.  Plaintiffs and members of the Class did not discover, and could not have discovered, through the exercise of reasonable diligence, the true nature of the unlawful fees assessed against their accounts.

77.     Legal scholars have explained that, as a result of these deceptive practices, it is impossible for borrowers to determine that they are victims of these violations, because "without a true itemization that identifies the nature of each fee, parties cannot verify that a mortgage claim is correctly calculated . . . the servicer could be overreaching and charging fees that are not permitted by law or by the terms of the contract.  . . . By obscuring the information needed to determine the alleged basis for the charges, servicers thwart effective review of mortgage claims. The system can only function as intended if

complete and appropriate disclosures are made."[9]

78.    Additionally, judges examining similar conduct have found that, "[a]t the heart of the problem is [the loan servicer's] failure to disclose to its borrowers/debtors, the trustee, or the Court, the nature or amount of fees and charges assessed . . . [l]ack of disclosure facilitates the injury.  Naive borrowers/debtors, trustees and creditors rightly assume that [the loan servicer] is complying with the plain meaning of its notes, mortgages, court orders and confirmed plans.  Why would anyone assume otherwise?  . . . How are they to challenge a practice or demand correction of an error they do not know exists."[10]

## CLASS ACTION ALLEGATIONS

79.    Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action under Rule 23 of the Federal Rules of Civil Procedure.

80.    The class Plaintiffs seek to represent (collectively, the "Class") is defined as follows:

> All residents of the United States of America who had a loan
> serviced by CitiMortgage and whose accounts were assessed
> fees for default-related services, including Broker's Price
> Opinions and inspection fees, at any time, continuing through
> the date of final disposition of this action.

81.    Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveals that the Class should be expanded or otherwise modified.

82.    Plaintiffs reserve the right to establish sub-classes as appropriate.

83.    This action is brought and properly may be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3), and satisfies the requirements thereof.  As used herein, the term "Class Members" shall mean and refer to the members of the Class.

---

[9] *See* Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87 Tex. L. Rev. 121, 155 (2008).

[10] *See In re: Jones*, 418 B.R. 687, 699 (E.D. La. 2009).

84.    <u>Numerosity</u>:  While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants.  At this time, Plaintiffs are informed and believe that the Class includes hundreds of thousands of members.  Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

85.    <u>Ascertainablity</u>:  Names and addresses of members of the Class are available from Defendants' records.  Notice can be provided to the members of the Class through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

86.    <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the other members of the Class which they seek to represent under Federal Rule of Civil Procedure 23(a)(3) because each Plaintiff and each member of the Class has been subjected to the same deceptive and improper practices and has been damaged in the same manner thereby.

87.    <u>Adequacy</u>:  Plaintiffs will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4).  Plaintiffs are adequate representatives of the Class, because they have no interests which are adverse to the interests of the members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

88.    <u>Superiority</u>: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a)    The expense and burden of individual litigation make it economically unfeasible for members of the Class to seek to redress their claims

19

Case No.: 4:12-cv-03892-YGR

1    other than through the procedure of a class action.

2    (b)    If separate actions were brought by individual members of the Class,

3           the resulting duplicity of lawsuits would cause members to seek to

4           redress their claims other than through the procedure of a class action;

5           and

6    (c)    Absent a class action, Defendants likely would retain the benefits of

7           their wrongdoing, and there would be a failure of justice.

8    89.    Common questions of law and fact exist as to the members of the Class, as

9    required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions

10   which affect individual members of the Class within the meaning of Federal Rule of Civil

11   Procedure 23(b)(3).

12   90.    The common questions of fact include, but are not limited to, the following:

13   (a)    Whether Defendants engaged in unlawful, unfair, misleading, or

14          deceptive business acts or practices in violation of California Business

15          & Professions Code sections 17200 *et seq.*;

16   (b)    Whether Defendants' practice of charging fees for unnecessary

17          default-related services to borrowers, as alleged herein, is illegal;

18   (c)    Whether Defendants were members of, or participants in the

19          conspiracy alleged herein;

20   (d)    Whether Defendants engaged in a pattern or practice of racketeering,

21          as alleged herein;

22   (e)    Whether documents and statements provided to Plaintiffs and

23          members of the Class omitted material facts;

24   (f)    Whether Plaintiffs and members of the class sustained damages, and if

25          so, the appropriate measure of damages; and

26   (g)    Whether Plaintiffs and members of the Class are entitled to an award

27          of reasonable attorneys' fees, pre-judgment interest, and costs of this

28          suit.

91.     In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

(a)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants;

(b)     The prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

(c)     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole and necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

92.     Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action

## FIRST CAUSE OF ACTION

### Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(c))

93.      Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

94.     Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

**THE ENTERPRISE**

95.    Defendants Citibank, N.A., and CitiMortgage, Inc. are each persons within the meaning of Title 18 United States Code section 1961(3).

96.    At all relevant times, in violation of Title 18 United States Code section 1962(c), Citibank, N.A., CitiMortgage, Inc., including their directors, employees, and agents, along with their property inspection and preservation vendor Safeguard, and the real estate brokers who provide BPOs for Citi, including Corelogic, conducted the affairs of an association-in-fact enterprise, as that term is defined in Title 18 United States Code section 1961(4) (the "Citi Enterprise").  The affairs of the Citi Enterprise affected interstate commerce through a pattern of racketeering activity.

97.    The Citi Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of routinely, and repeatedly, ordering, conducting, and assessing borrowers' accounts for unnecessary default-related services.

98.    While the members of the Citi Enterprise participate in and are part of the enterprise, they also have an existence separate and distinct from the enterprise.  The Citi Enterprise has a systematic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities between Defendants, their property inspection and preservation vendor Safeguard, and the real estate brokers who perform BPOs for Citi, including Corelogic.

99.    Operating the Citi Enterprise according to policies and procedures developed and established by their executives, Citibank, N.A., and CitiMortgage, Inc. control and direct the affairs of the Citi Enterprise and use the other members of the Citi Enterprise as instrumentalities to carry out Citi's fraudulent scheme.

100.    These policies and procedures established by Citi's executives include: programing Citi's automated loan management system to order default related services, including property inspections and BPOs, and assess fees against borrowers when they are a certain number of days late on their mortgage, regardless of whether conducting such

default-related services is reasonable or necessary under the circumstances; directing Safeguard to conduct property inspections without consideration for whether they are necessary; providing statements that fail to disclose the true nature of the unnecessary fees; cryptically identifying default-related service fees as "Delinquency Expenses"; and failing to provide borrowers with documentation to support assessments of fees for BPOs.

101.   The guidelines developed by Citi's executives -- based, in part, on guidelines issued by the lenders and/or investors for whom Citi services loans -- and programmed into Citi's loan management software system automatically trigger property inspections if a loan is past due by a certain number of days.  On a nightly basis, Citi's automated loan management system reviews all loans to determine which are delinquent by the specified number of days, and then orders inspections of the properties securing all such loans electronically from Safeguard.  This entire process occurs without any human intervention.

102.   Upon receiving the property inspection orders, Safeguard conducts the inspections according to policies and procedures developed collaboratively with Citi. Thereafter, Safeguard generates a report for each property inspection, which it maintains on its database.  Safeguard then uploads certain "data points" from the report to Citi's loan management system.  As a general rule, no Citi employee reviews any of the actual inspection reports generated and maintained by Safeguard.  Instead, Safeguard employees conduct daily reviews of the results obtained from the property inspections.

103.   After a property inspection is ordered from Safeguard, borrowers are assessed fees for the inspection electronically by Citi's automated loan management system.  These fees are then cryptically identified on borrowers' monthly account statements as "Delinquency Expenses."

104.   As long as a borrower's account is past due by the requisite number of days programmed into Citi's loan management software, its system automatically continues to order inspections, regardless of whether they are necessary.

105.   Citi's policy and procedure of ordering property inspections when they are a

certain number of days late on their mortgage is based on guidelines established by the government-sponsored enterprises ("GSEs") that own many of the mortgages serviced by Citi, including Fannie Mae.

106.   However, Fannie Mae has expressly warned Citi and other mortgage servicers not to charge borrowers for multiple property inspections unless the specific circumstances of a particular loan warrant it.  In particular, Section 203.04 (Fees for Special Services) of Fannie Mae's Single Family Servicing Guide details Fannie's Mae's expectation that every servicer will have in place clearly written policies regarding fee assessment, including Fannie Mae's limitation that fees be charged to a borrower on a repetitive basis only when required or permitted by Fannie Mae's Guides or otherwise clearly supported by the circumstances relating to a particular mortgage.  As an example, Fannie Mae's Servicing Guide expressly states that charging a delinquent borrower's account for monthly property inspections generally would not be a permissible practice unless the servicer determines that the circumstances warrant multiple inspections.

107.   Moreover, it is the uniform mortgage note instrument executed by the borrowers (rather than just Citi's agreements with investors and GSEs) that supplies the purported legal justification for Citi's authority to bill borrowers for these inspections, and these notes *do not* permit the indiscriminate ordering and billing of multiple property inspections engaged in by Citi.

108.   Nevertheless, once a borrower falls behind on their mortgage payments by forty-five days or more, CitiLink automatically orders an initial drive-by inspection of the property securing that mortgage loan.  After this initial inspection, and regardless of the outcome of that inspection, Citi's loan management system continues to order subsequent inspections every 30-days for as long as the borrower remains delinquent.

109.   By developing and implementing policies and procedures leading to the repeated, and unlawful, ordering and assessment of fees for unnecessary default-related services, Citibank, N.A. and CitiMortgage, Inc. engaged in the conduct of the Citi Enterprise distinct from Citi's own affairs as a loan servicer and inconsistent with the

servicing guidelines under which it is obligated to operate.

### THE PREDICATE ACTS

110.   Defendants' systematic schemes to fraudulently conceal assessments of unnecessary third party fees on the accounts of borrowers who have mortgage loans administered by CitiMortgage, Inc., as described above, was facilitated by the use of the United States Mail and wire.  Defendants' schemes constitute "racketeering activity" within the meaning of Title 18 United States Code section 1961(1), as acts of mail and wire fraud, under Title 18 United States Code sections 1341 and 1343.

111.   In violation of Title 18 United States Code sections 1341 and 1343, Defendants utilized the mail and wire in furtherance of their scheme to defraud borrowers whose loans are serviced by CitiMortgage by obtaining money from borrowers using false or fraudulent pretenses.

112.   Through the mail and wire, the Defendants provided mortgage invoices, loan statements, payoff demands, or proofs of claims to borrowers, demanding that borrowers pay fraudulently concealed unnecessary fees for default-related services, such as BPOs or property inspections.  Defendants also accepted payments and engaged in other correspondence in furtherance of their scheme through the mail and wire.

113.   The mortgage invoices, loan statements, or proofs of claims provided to borrowers fraudulently concealed the true nature of assessments made on borrowers' accounts.  Defendants use false pretenses, identifying the fees on mortgage invoices, loan statements, or proofs of claims only as "Delinquency Expenses" to obtain full payments from borrowers, Defendants disguised the true nature of these fees and omitted payment of fees for default-related services that were unnecessary.  By omitting and fraudulently concealing the true nature of amounts purportedly owed, and the guidelines under which Citi is obligated to operate that expressly prohibit Defendants' conduct, in communications to borrowers, Defendants made false statements using the Internet, telephone, facsimile, United States mail, and other interstate commercial carriers.

114.   Furthermore, to lull borrowers into a sense of trust, conceal Defendants'

unlawful fees, and dissuade borrowers from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme from borrowers by telling them, in statements and other documents, that "Delinquency expenses are third-party expenses such as property inspection fees, property preservation costs, appraisal costs, and attorney fees incurred by CMI as a result of default," without disclosing that such fees are for unnecessary default-related services, and by merely giving a list of potential types of fees without a true itemization, leaving borrowers unable to know the true nature of the fees that are assessed under the "Delinquency Expenses" description.

115.   Defendants' omissions were material to Plaintiffs and the members of the Class.  Had Defendants disclosed the true unnecessary nature of the fees for default-related services, Plaintiffs would have been aware and would have challenged Defendants' unlawful fee assessments or they would not have paid them.

116.   Each of these acts constituted an act of mail fraud for purposes of Title 18 United States Code section 1341.

117.   Additionally, using the Internet, telephone, and facsimile transmissions to fraudulently communicate false information about these fees to borrowers, to pursue and achieve their fraudulent scheme, Defendants engaged in repeated acts of wire fraud in violation of Title 18 United States Code section 1343.

118.   In an effort to pursue their fraudulent scheme, Defendants knowingly fraudulently concealed or omitted material information from Plaintiffs and members of the Class.  Defendants' knowledge that their activities were fraudulent and unlawful is evidenced by, among other things, the fact that they did not disclose the unnecessary nature of the fees in their communications to borrowers.

119.   The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of Title 18 United States Code section 1961(5) in which Defendants have engaged under Title 18 United States Code section 1962(c).

120.   All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Citi Enterprise racketeering enterprise.  The

racketeering acts committed by the Citi Enterprise employed a similar method, were related, with a similar purpose, and they involved similar participants, with a similar impact on the members of the Class.  Because this case is brought on behalf of a class of similarly situated borrowers and there are numerous acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiffs to plead all of the details of the scheme with particularity.  Plaintiffs cannot plead the precise dates of all of Defendants' uses of the mail and wire because this information cannot be alleged without access to Defendants' records.

121.   The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

122.   Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

123.   As a direct and proximate result of these violations of Title 18 United States Code sections 1962(c) and (d), Plaintiffs and members of the class have suffered substantial damages.  Defendants are liable to Plaintiffs and members of the Class for treble damages, together with all costs of this action, plus reasonable attorney's fees, as provided under Title 18 United States Code section 1964(c).

## SECOND CAUSE OF ACTION

**Violation of the Racketeer Influenced and Corrupt Organizations Act, Conspiracy to Violate Title 18 United States Code section 1962(c) (18 U.S.C. § 1962(d))**

124.   Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

125.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

126.   As set forth above, in violation of Title 18 United States Code section 1962(d), defendants Citibank, N.A., and CitiMortgage, Inc. conspired to violate the

1  provisions of Title 18 United States Code section 1962(c).

2      127.    As set forth above, Defendants, having directed and controlled the affairs of

3  the Citi Enterprise, were aware of the nature and scope of the enterprise's unlawful

4  scheme, and they agreed to participate in it.

5      128.    As a direct and proximate result, Plaintiffs and the members of the Class

6  have been injured in their business or property by the predicate acts which make up

7  Defendants' patterns of racketeering activity in that unnecessary fees for default-related

8  services were assessed on their mortgage accounts.

9                          **THIRD CAUSE OF ACTION**

10                               **Unjust Enrichment**

11      129.    Plaintiffs incorporate by reference in this cause of action each and every

12  allegation of the preceding paragraphs, with the same force and effect as though fully set

13  forth herein.

14      130.    Plaintiffs bring this cause of action on behalf of themselves and the members

15  of the Class.

16      131.    By their wrongful acts and omissions of material facts, Defendants were

17  unjustly enriched at the expense of Plaintiffs and members of the Class.

18      132.    The mortgage contract with borrowers like Plaintiffs and the members of the

19  Class discloses that Defendants will pay for default-related services when necessary, and

20  they will be reimbursed by the borrower.  Nowhere in the mortgage contract is it disclosed

21  that Defendants may incur unnecessary third party fees.

22      133.    Nevertheless, Defendants assess fees for default-related services on

23  borrowers' accounts without adequate concern for whether they are necessary.

24      134.    Thus, Plaintiffs and members of the Class were unjustly deprived.

25      135.    Defendants are aware that it is improper to assess unnecessary third party

26  fees on borrowers' accounts for default-related services.  Therefore, Defendants

27  fraudulently conceal these fees on borrowers' accounts by identifying them on mortgage

28  statements only as "Delinquency Expenses."

136.   Furthermore, to lull borrowers into a sense of trust, conceal Defendants' unlawful fees, and dissuade borrowers from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme from borrowers by telling them, in statements and other documents, that such fees are "Delinquency expenses are third-party expenses such as property inspection fees, property preservation costs, appraisal costs, and attorney fees incurred by CMI as a result of default," without disclosing that such fees are for unnecessary default-related services, and by merely giving a list of potential types of fees without a true itemization, leaving borrowers unable to know the true nature of the fees that are assessed under the "Delinquency Expenses" description.

137.   It would be inequitable and unconscionable for Defendants to retain the profit, benefit and other compensation they obtained from their fraudulent, deceptive, and misleading conduct alleged herein.

138.   Plaintiffs and members of the Class seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

## FOURTH CAUSE OF ACTION

### Fraud

139.   Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.  Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

140.   Defendants concealed and suppressed material facts, namely, the fact that Defendants assess borrowers' accounts for unnecessary default-related services, which is inconsistent with the servicing guidelines under which Defendants are obligated to operate.  In truth and in fact, borrowers are not obligated to pay the amounts that have been specified in Defendants' communications for default-related services, such as BPOs and property inspections.  Contrary to Defendants' communications, Defendants are not legally authorized to assess and collect these fees.

141.   Defendants omit a true itemization that identifies the nature of each fee, and they fail to disclose the nature of the charges and fees assessed.  Defendants conceal the fact the category identified as "Delinquency Expenses" reflects unnecessary fees.

142.   Plaintiffs relied their reasonable expectation that Defendants comply with the disclosures set forth in the mortgage agreement, Notes, and Security Instruments, and as a result, Plaintiffs relied on Defendants' disclosures about the fees on their statements, reasonably believing the "Delinquency Expenses" to be valid charges that were not unnecessary.

143.   Indeed, to lull borrowers into a sense of trust and dissuade them from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme by telling borrowers, in statements and other documents, that such fees are "Delinquency expenses are third-party expenses such as property inspection fees, property preservation costs, appraisal costs, and attorney fees incurred by CMI as a result of default," without disclosing that such fees are for unnecessary default-related services, and by merely giving a list of potential types of fees without an itemization, leaving borrowers unable to know the true nature of the fees that are assessed under the "Delinquency Expenses" description.

144.   Had the true nature of the fees been disclosed to Plaintiffs and members of the Class, they would have been aware of the unnecessary nature of the fees, and Plaintiffs would have disputed the charges and not paid them

145.   Defendants knew their concealment and suppression of materials facts was false, misleading, and in violation of the disclosures made to borrowers because the fees exceed the actual cost of the services.

146.   As a result of Defendants' fraudulent omissions and failures to disclose, Plaintiffs and members of the Class have been injured in fact and suffered a loss of money or property.  Plaintiffs and members of the Class would not have paid Defendants' fees or they would have challenged the assessment of such fees on their accounts had it not been for Defendants' concealment of material facts.

147.   Defendants omitted and concealed material facts, as discussed above, with knowledge of the effect of concealing of these material facts.  Defendants knew that by misleading consumers, they would generate higher profits.

148.   Plaintiffs and members of the Class justifiably relied upon Defendants' knowing, affirmative, and active concealment.  By concealing material information about their scheme to assess fees for unnecessary property inspections on borrowers' accounts, Defendants intended to induce Plaintiffs and members of the Class into believing that they owed Defendants money that Defendants were not actually entitled.

149.   Defendants acted with malice, oppression, or fraud.

150.   As a direct and proximate result of Defendants' omissions and active concealment of material facts, Plaintiffs and each member of the Class has been damaged in an amount according to proof at trial.

## PRAYER FOR RELIEF

Plaintiffs, and on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

1.   Certifying the Class, as requested herein, certifying Plaintiffs as the representatives of the Class, and appointing Plaintiffs' counsel as counsel for the Class;

2.   Ordering that Defendants are financially responsible for notifying all members of the Class of the alleged omissions discussed herein;

3.   Awarding Plaintiffs and the members of the Class compensatory damages in an amount according to proof at trial;

4.   Awarding restitution and disgorgement of Defendants' revenues or profits to Plaintiffs and members of the Class;

5.   Awarding Plaintiffs and the members of the Class treble damages in an amount according to proof at trial;

6.   Awarding declaratory and injunctive relief as permitted by law or equity, including:  enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of its conduct

1  and pay them restitution and disgorgement of all monies acquired by Defendants by
2  means of any act or practice declared by this Court to be wrongful;

3       7.    Ordering Defendants to engage in corrective advertising;

4       8.    Awarding interest on the monies wrongfully obtained from the date of
5  collection through the date of entry of judgment in this action;

6       9.    Awarding attorneys' fees, expenses, and recoverable costs reasonably
7  incurred in connection with the commencement and prosecution of this action; and

8      10.    For such other and further relief as the Court deems just and proper.
9  Dated:  May 30, 2014             BARON & BUDD, P.C.

11               By:  __/s/ Mark Pifko_____
                  Mark Pifko

13               Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Mark Pifko (SBN 228412)
Isaac Miller (SBN 266459)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:  (818) 839-2333
Facsimile:   (818) 986-9698

Attorneys for Plaintiffs
GLORIA STITT, RONALD STITT, JUDI
SHATZER, MARK ZIRLOTT, and TERRI
LOUISE ZIRLOTT, individually, and on
behalf of other members of the public
similarly situated

1

## <u>DEMAND FOR JURY TRIAL</u>

2

   Plaintiffs hereby demand a trial of their claims by jury to the extent authorized by

3

law.

4

Dated: May 30, 2014                               BARON & BUDD, P.C.

5

6                                                 By:   /s/ Mark Pifko
                                                       Mark Pifko
7

8                                                 Daniel Alberstone (SBN 105275)
                                                  Roland Tellis (SBN 186269)
9                                                 Mark Pifko (SBN 228412)
                                                  Isaac Miller (SBN 266459)
10                                                BARON & BUDD, P.C.
                                                  15910 Ventura Boulevard, Suite 1600
11                                                Encino, California  91436
                                                  Telephone:   (818) 839-2333
12                                                Facsimile:   (818) 986-9698

13                                                Attorneys for Plaintiffs
                                                  GLORIA STITT, RONALD STITT, JUDI
14                                                SHATZER, MARK ZIRLOTT, and TERRI
                                                  LOUISE ZIRLOTT, individually, and on
15                                                behalf of other members of the public
                                                  similarly situated
16

17

18

19

20

21

22

23

24

25

26

27

28