# Pifko Declaration
# Exhibit 1

Redacted Due to Confidential Designation

# Pifko Declaration
# Exhibit 2

Redacted Due to
Confidential
Designation

# Pifko Declaration
# Exhibit 3



# Fannie Mae Single Family

# 2012 Servicing Guide

March 14, 2012

CONFIDENTIAL

**Lender Relationships**

Contractual Relationship

Section 203                                                            March 14, 2012

In either case, the servicer should specify whether the original note is required or whether the request is for a copy.

**Section 202.07.04 Reversion of Possession to Fannie Mae (05/23/08)**

At the conclusion of the servicer's representation of Fannie Mae's interests in the foreclosure, bankruptcy, probate, or other legal proceeding, or upon the servicer ceasing to service the loan for any reason, possession automatically reverts to Fannie Mae, and Fannie Mae resumes being the holder for itself, just as it was before the foreclosure, bankruptcy, probate, or other legal proceeding. If the servicer has obtained physical possession of the original note, it must be returned to Fannie Mae or the document custodian, as applicable.

**Section 203 Servicing Compensation (01/31/03)**

As compensation for servicing mortgage loans for Fannie Mae, Fannie Mae pays the servicer servicing fees and allows it to retain late charges, fees charged for special services, yield differential adjustments, and, in some cases, either a share or all of any applicable prepayment premiums that Fannie Mae permits under the terms of a negotiated contract.

A servicer may not sell, assign, transfer, pledge, or hypothecate its servicing compensation (or any portion of it) or enter into any agreement that would result in the sale, assignment, transfer, pledge, or hypothecation of that income or its servicing rights, except under the conditions and circumstances specified in *Section 201.07, Pledge of Servicing Rights (03/29/10)*.

**Section 203.01 Servicing Fees (09/30/05)**

Servicing fees are payable to the servicer from the time Fannie Mae purchases or securitizes a mortgage loan until it is paid in full (or otherwise removed from an MBS pool or Fannie Mae's active accounting records), as long as the servicer collects or remits the mortgage loan payments. *Exhibit 2: Servicing Fees for Portfolio Mortgage Loans and MBS Mortgage Loans* includes the current minimum (and, if applicable, maximum) allowable servicing fees for various types of mortgage loans. Historically, the servicing fees Fannie Mae paid for first- and second-lien mortgage loans could vary based on the delivery method, ownership interest, remittance type, amortization type, and purchase date. The exact servicing fee that applies to any given mortgage loan appears on the trial balance report that is produced by Fannie Mae's investor reporting system (see *Part X, Chapter 5, Fannie Mae–Generated Reports*).

CONFIDENTIAL                                                    CITI-STITT00372239

Because servicing fees are computed on the same UPB and for the same period as the interest portion of the monthly installment, the servicer generally can base its servicing fee calculation on the interest collected. However, when a mortgage loan is undergoing negative amortization, servicing fees should be based on the interest amount that is accrued, rather than on the amount that was actually collected.

For mortgage loans where military indulgence is warranted or required under the Servicemembers Civil Relief Act, see *Part III, Exhibit 1: Military Indulgence,* for calculation of servicing fees.

The servicer can obtain its servicing fee compensation by:

- deducting its fee from each borrower's payment before it is deposited to the custodial account,

- writing itself a check against its custodial account for the amount of servicing fee that is due each month,

- deducting its fee from the amount sent to Fannie Mae when the borrower pays off his or her mortgage loan, and

- deducting its fee from the proceeds of a third-party foreclosure sale or from the amount remitted to redeem an acquired property.

The servicer also retains as additional servicing compensation for a portfolio mortgage loan the amount by which the mortgage coupon rate exceeds Fannie Mae's pass-through rate for a whole mortgage loan or Fannie Mae's required yield for a participation pool mortgage loan. The servicer of an MBS mortgage loan retains as additional servicing compensation the amount by which the mortgage coupon rate exceeds the pass-through rate (or the pool accrual rate for a stated-structure ARM MBS pool or the accrual rate for the mortgage loan if it is in a weighted-average ARM MBS pool) to the extent that it is greater than the minimum allowable retained servicing spread but less than the maximum allowable retained servicing spread.

Section 203.02
Yield Differential
Adjustments (01/31/03)

When the interest rate of an actual/actual remittance type fixed-rate whole mortgage loan is greater than Fannie Mae's required yield, it allows the servicer to retain all or part of this difference. A similar concept applies for actual/actual remittance type ARMs when the mortgage margin—or net

CONFIDENTIAL                                                   CITI-STITT00372240

---

**Lender Relationships**

Contractual Relationship

Section 203                                                                                        March 14, 2012

---

mortgage margin for net yield commitments—exceeds Fannie Mae's required commitment margin. In addition, ARMs may have a short-term yield differential until the first interest rate change if the "base interest rate" or "net mortgage rate" exceeds Fannie Mae's required yield.

The exact amount of yield differential adjustment that the servicer may retain is usually determined by the policy that was in effect when Fannie Mae issued its commitment to purchase the mortgage loan. Fannie Mae's present yield differential adjustment policy and a historical record of the various yield differential adjustment policies that may apply to mortgage loans in the servicer's portfolio appear in *Exhibit 3: Historical Yield Differential Adjustment Provisions*.

The servicer can determine the yield differential adjustment applicable to each monthly payment the same way it calculates servicing fees.

Yield differential adjustments may be changed, or eliminated altogether, under these conditions:

- If Fannie Mae sells the mortgage loan or an interest in it, any yield differential adjustment will be eliminated—although Fannie Mae's pooling of portfolio mortgage loans to form an MBS will not affect the servicer's yield differential adjustment.

- If Fannie Mae terminates the servicer's right to service the mortgage loan (either with cause or without cause) or if the servicer chooses to terminate its servicing responsibility under the terms of the Lender Contract, any yield differential adjustment will be eliminated (unless Fannie Mae agrees otherwise in writing).

- If Fannie Mae purchased an ARM at a **discount**, the yield differential adjustment will be eliminated when the first interest rate adjustment occurs. (See *Exhibit 3: Historical Yield Differential Adjustment Provisions* for an exception to this policy.)

- If Fannie Mae purchased an ARM at **par**, the yield differential adjustment may be reduced when the first interest rate change occurs. (See *Exhibit 3: Historical Yield Differential Adjustment Provisions* for an explanation of how the new yield differential adjustment is determined.)

---

**Page 102-42**

---

Section 203.03
Late Charges (07/10/09)

The servicer may collect any late charges that are provided for in the mortgage instrument as long as they are consistent with federal and state laws. For specific information about the assessment of late charges, refer to *Part VII, Section 301, Assessing Late Charges (07/10/09)*. To assist Fannie Mae in complying with IRS reporting requirements, the servicer should report the amount of late charges it collects each month for a given mortgage loan as part of the monthly activity information it provides through Fannie Mae's investor reporting system.

Section 203.04
Fees for Special Services
(11/01/04)

Fannie Mae expects that every servicer will have in place clearly written policies regarding fee assessment, and that those policies will ensure that fees comply with applicable laws and regulations, are consistent with the governing mortgage documents or are otherwise agreed upon by the borrower, and address four points in particular:

- the types or categories of fees and, if known, specific amounts of fees that may be assessed to borrowers for services that are above and beyond the ordinary and customary activities performed by the servicer covered by its servicing fee and related income;

- that any fees charged to borrowers (or reimbursed by Fannie Mae) must be related to work actually done by the servicer, either directly or indirectly through third parties, including affiliates of the servicer, and may not entail compensation to third parties for work or services not performed;

- that the assessment of any fees (other than foreclosure and bankruptcy-related fees that are incurred to enforce the mortgage loan obligation) are allowed pursuant to the provisions of Fannie Mae's Guides, and are clearly disclosed to borrowers in advance of the rendering of the service (where practical) or subsequently (e.g., on monthly statements), or as may be required by applicable law. (For any service requested by the borrower for which there are options or alternatives for free or reduced costs for similar services (e.g., mail versus fax charges), such services should be explained to the borrower before the service is provided.); and

- that fees may be charged on a repetitive basis only when required or permitted by Fannie Mae's Guides or otherwise clearly supported by the circumstances relating to a particular mortgage loan (e.g., charging

CONFIDENTIAL                                                          CITI-STITT00372242

**Lender Relationships**

Contractual Relationship

Section 203                                                                        March 14, 2012

==a delinquent borrower's account for monthly property inspections==
==generally would not be a permissible practice unless the servicer==
==determines that the circumstances warrant multiple inspections).==

As described in the Lender Contract, the lender bears the cost of servicing mortgage loans sold to Fannie Mae, except as expressly provided otherwise in Fannie Mae's Guides. The servicing fee that Fannie Mae pays a servicer and the other revenue sources consistent with the Guides are intended to compensate the servicer for a variety of standard activities associated with the servicing of mortgage loans. Fees relating to the following activities should not be charged to the borrower:

- handling borrower disputes;

- facilitating routine borrower collections;

- arranging repayment or forbearance plans;

- sending borrowers notices (sometimes called "demand" or "breach" letters) relating to nonpayment of principal, interest, taxes, or insurance in advance of a formal acceleration notice that matures the mortgage loan principal balance and begins the foreclosure process; and

- updating the servicer's records to "reinstate" a mortgage loan that has been brought current.

The servicing fee generally is not intended to encompass certain additional work (special services) that the servicer performs at the borrower's request or on the borrower's behalf. Special services include work related to a change in ownership of the security property, replacement of insurance policies, a release of the security, providing expedited service via fax, providing more than one payoff statement in a short period of time (or even a single payoff statement if applicable law expressly permits a borrower fee), providing duplicate copies of loan documents, accepting a "phone pay" payment, and consummating the assumption or modification of a mortgage loan. Also, the servicing fee generally is not intended to encompass certain additional work that the servicer performs at Fannie Mae's request (e.g., performing certain property inspections on mortgage loans in default, handling certain loss mitigation activities for which

**Page 102-44**

CONFIDENTIAL                                                    CITI-STITT00372243

**Pifko Declaration
Exhibit 4**

Redacted Due to
Confidential
Designation

# Pifko Declaration
# Exhibit 5

Redacted Due to
Confidential
Designation

# Pifko Declaration
# Exhibit 6

Redacted Due to
Confidential
Designation

# Pifko Declaration
# Exhibit 7

Redacted Due to
Confidential
Designation

**Pifko Declaration
Exhibit 8**

Redacted Due to
Confidential
Designation

# Pifko Declaration
# Exhibit 9

Redacted Due to
Confidential
Designation

# Pifko Declaration
# Exhibit 10

Redacted Due to
Confidential
Designation

**Pifko Declaration
Exhibit 11**

Redacted Due to
Confidential
Designation

# Pifko Declaration
# Exhibit 12

Redacted Due to
Confidential
Designation

**Pifko Declaration
Exhibit 13**

# UNITED STATES OF AMERICA
## DEPARTMENT OF THE TREASURY
## COMPTROLLER OF THE CURRENCY

|  |  |  |
|---|---|---|
| **In the Matter of:** | ) ) ) | AA-EC-11-13 |
| Citibank, N.A. | ) |  |
| Las Vegas, Nevada | ) ) ) |  |

## CONSENT ORDER

The Comptroller of the Currency of the United States of America ("Comptroller"), through his national bank examiners and other staff of the Office of the Comptroller of the Currency ("OCC"), as part of an interagency horizontal review of major residential mortgage servicers, has conducted an examination of the residential real estate mortgage foreclosure processes of Citibank, N.A., Las Vegas, Nevada ("Bank"). The OCC has identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings. The OCC has informed the Bank of the findings resulting from the examination.

The Bank, by and through its duly elected and acting Board of Directors ("Board"), has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated April 13, 2011 ("Stipulation and Consent"), that is accepted by the Comptroller. By this Stipulation and Consent, which is incorporated by reference, the Bank has consented to the issuance of this Consent Cease and Desist Order ("Order") by the Comptroller. The Bank has committed to taking all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound practices identified by the OCC, and to enhance the Bank's residential mortgage servicing and

foreclosure processes.  The Bank has begun implementing procedures to remediate the practices addressed in this Order.

## ARTICLE I

## COMPTROLLER'S FINDINGS

The Comptroller finds, and the Bank neither admits nor denies, the following:

(1)  The Bank is among the largest servicers of residential mortgages in the United States, and services a portfolio of 4,000,000 residential mortgage loans.  During the recent housing crisis, a substantially large number of residential mortgage loans serviced by the Bank became delinquent and resulted in foreclosure actions.  The Bank's foreclosure inventory grew substantially from January 2009 through December 2010.

(2)  In connection with certain foreclosures of loans in its residential mortgage servicing portfolio, the Bank:

(a)  filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records;

(b)  filed or caused to be filed in state and federal courts, or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary;

(c)  litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time;

(d)  failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes;

(e)  failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and

(f)  failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services.

(3)  By reason of the conduct set forth above, the Bank engaged in unsafe or unsound banking practices.

Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. §1818(b), the Comptroller hereby ORDERS that:

ARTICLE II

COMPLIANCE COMMITTEE

(1)  The Board shall maintain a Compliance Committee of at least three (3) directors, of which at least two (2) may not be employees or officers of the Bank or any of its subsidiaries or affiliates.  In the event of a change of the membership, the name of any new member shall be submitted to the Examiner-in-Charge for Large Bank Supervision at the Bank ("Examiner-in-Charge").  The Compliance Committee shall be responsible for monitoring and coordinating the

3

Bank's compliance with the provisions of this Order.  The Compliance Committee shall meet at least monthly and maintain minutes of its meetings.

(2)  Within ninety (90) days of this Order, and within thirty (30) days after the end of each quarter thereafter, the Compliance Committee shall submit a written progress report to the Board setting forth in detail actions taken to comply with each Article of this order, and the results and status of those actions.

(3)  The Board shall forward a copy of the Compliance Committee's report, with any additional comments by the Board, to the Deputy Comptroller for Large Bank Supervision ("Deputy Comptroller") and the Examiner-in-Charge within ten (10) days of receiving such report.


ARTICLE III

COMPREHENSIVE ACTION PLAN

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan containing a complete description of the actions that are necessary and appropriate to achieve compliance with Articles IV through XII of this Order ("Action Plan").  In the event the Deputy Comptroller asks the Bank to revise the Action Plan, the Bank shall promptly make the requested revisions and resubmit the Action Plan to the Deputy Comptroller and the Examiner-in-Charge.  Following acceptance of the Action Plan by the Deputy Comptroller, the Bank shall not take any action that would constitute a significant deviation from, or material change to, the requirements of the Action Plan or this Order, unless and until the Bank has received a prior written determination of no supervisory objection from the Deputy Comptroller.

4

(2)  The Board shall ensure that the Bank achieves and thereafter maintains compliance with this Order, including, without limitation, successful implementation of the Action Plan. The Board shall further ensure that, upon implementation of the Action Plan, the Bank achieves and maintains effective mortgage servicing, foreclosure, and loss mitigation activities (as used herein, the phrase "loss mitigation" shall include, but not be limited to, activities related to special forbearances, modifications, short refinances, short sales, cash-for-keys, and deeds-in-lieu of foreclosure and be referred to as either "Loss Mitigation" or "Loss Mitigation Activities"), as well as associated risk management, compliance, quality control, audit, training, staffing, and related functions.  In order to comply with these requirements, the Board shall:

(a)  require the timely reporting by Bank management of such actions directed by the Board to be taken under this Order;

(b)  follow-up on any non-compliance with such actions in a timely and appropriate manner; and

(c)  require corrective action be taken in a timely manner for any non-compliance with such actions.

(3)  The Action Plan shall address, at a minimum:

(a)  financial resources to develop and implement an adequate infrastructure to support existing and/or future Loss Mitigation and foreclosure activities and ensure compliance with this Order;

(b)  organizational structure, managerial resources, and staffing to support existing and/or future Loss Mitigation and foreclosure activities and ensure compliance with this Order;

(c)  metrics to measure and ensure the adequacy of staffing levels relative to existing and/or future Loss Mitigation and foreclosure activities, such as limits for the number of loans assigned to a Loss Mitigation employee, including the single point of contact as hereinafter defined, and deadlines to review loan modification documentation, make loan modification decisions, and provide responses to borrowers;

(d)  governance and controls to ensure compliance with all applicable federal and state laws (including the U.S. Bankruptcy Code and the Servicemembers Civil Relief Act ("SCRA")), rules, regulations, and court orders and requirements, as well as the Membership Rules of MERSCORP, servicing guides of the Government Sponsored Enterprises ("GSEs") or investors, including those with the Federal Housing Administration and those required by the Home Affordable Modification Program ("HAMP"), and loss share agreements with the Federal Deposit Insurance Corporation (collectively "Legal Requirements"), and the requirements of this Order.

(4)  The Action Plan shall specify timelines for completion of each of the requirements of Articles IV through XII of this Order.  The timelines in the Action Plan shall be consistent with any deadlines set forth in this Order.

ARTICLE IV

COMPLIANCE PROGRAM

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable compliance program to ensure that the mortgage servicing and foreclosure operations, including Loss Mitigation and loan modification, comply with all applicable Legal Requirements, OCC supervisory guidance, and the

requirements of this Order and are conducted in a safe and sound manner ("Compliance

Program").  The Compliance Program shall be implemented within one hundred twenty (120)

days of this Order.  Any corrective action timeframe in the Compliance Program that is in excess

of one hundred twenty (120) days must be approved by the Examiner-in-Charge.  The

Compliance Program shall include, at a minimum:

      (a)  appropriate written policies and procedures to conduct, oversee, and monitor

mortgage servicing, Loss Mitigation, and foreclosure operations;

      (b)  processes to ensure that all factual assertions made in pleadings, declarations,

affidavits, or other sworn statements filed by or on behalf of the Bank are accurate, complete,

and reliable; and that affidavits and declarations are based on personal knowledge or a review of

the Bank's books and records when the affidavit or declaration so states;

      (c)  processes to ensure that affidavits filed in foreclosure proceedings are

executed and notarized in accordance with state legal requirements and applicable guidelines,

including jurat requirements;

      (d)  processes to review and approve standardized affidavits and declarations for

each jurisdiction in which the Bank files foreclosure actions to ensure compliance with

applicable laws, rules and court procedures;

      (e)  processes to ensure that the Bank has properly documented ownership of the

promissory note and mortgage (or deed of trust) under applicable state law, or is otherwise a

proper party to the action (as a result of agency or other similar status) at all stages of foreclosure

and bankruptcy litigation, including appropriate transfer and delivery of endorsed notes and

assigned mortgages or deeds of trust at the formation of a residential mortgage-backed security,

and lawful and verifiable endorsement and successive assignment of the note and mortgage or deed of trust to reflect all changes of ownership;

(f)  processes to ensure that a clear and auditable trail exists for all factual information contained in each affidavit or declaration, in support of each of the charges that are listed, including whether the amount is chargeable to the borrower and/or claimable by the investor;

(g)  processes to ensure that foreclosure sales (including the calculation of the default period, the amounts due, and compliance with notice requirements) and post-sale confirmations are in accordance with the terms of the mortgage loan and applicable state and federal law requirements;

(h)  processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage note, mortgage, or other customer authorization with respect to the imposition of fees, charges, and expenses, and in compliance with all applicable Legal Requirements and OCC supervisory guidance;

(i)  processes to ensure that the Bank has the ability to locate and secure all documents, including the original promissory notes if required, necessary to perform mortgage servicing, foreclosure and Loss Mitigation, or loan modification functions;

(j)  ongoing testing for compliance with applicable Legal Requirements and OCC supervisory guidance that is completed by qualified persons with requisite knowledge and ability (which may include internal audit) who are independent of the Bank's business lines;

(k)  measures to ensure that policies, procedures, and processes are updated on an ongoing basis as necessary to incorporate any changes in applicable Legal Requirements and OCC supervisory guidance;

(l)  processes to ensure the qualifications of current management and supervisory personnel responsible for mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation and loan modification, are appropriate and a determination of whether any staffing changes or additions are needed;

(m)  processes to ensure that staffing levels devoted to mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation, and loan modification, are adequate to meet current and expected workload demands;

(n)  processes to ensure that workloads of mortgage servicing, foreclosure and Loss Mitigation, and loan modification personnel, including single point of contact personnel as hereinafter defined, are reviewed and managed.  Such processes, at a minimum, shall assess whether the workload levels are appropriate to ensure compliance with the requirements of Article IX of this Order, and necessary adjustments to workloads shall promptly follow the completion of the reviews.  An initial review shall be completed within ninety (90) days of this Order, and subsequent reviews shall be conducted semi-annually;

(o)  processes to ensure that the risk management, quality control, audit, and compliance programs have the requisite authority and status within the organization so that appropriate reviews of the Bank's mortgage servicing, Loss Mitigation, and foreclosure activities and operations may occur and deficiencies are identified and promptly remedied;

(p)  appropriate training programs for personnel involved in mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation, and loan modification, to ensure compliance with applicable Legal Requirements and supervisory guidance; and

(q)  appropriate procedures for customers in bankruptcy, including a prohibition on collection of fees in violation of bankruptcy's automatic stay (11 U.S.C. § 362), the discharge injunction (11 U.S.C. § 524), or any applicable court order.

## ARTICLE V

## THIRD PARTY MANAGEMENT

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge acceptable policies and procedures for outsourcing foreclosure or related functions, including Loss Mitigation and loan modification, and property management functions for residential real estate acquired through or in lieu of foreclosure, to any agent, independent contractor, consulting firm, law firm (including local counsel in foreclosure or bankruptcy proceedings retained to represent the interests of the owners of mortgages), property management firm, or other third-party (including any affiliate of the Bank) ("Third-Party Providers").  Third-party management policies and procedures shall be implemented within one hundred twenty (120) days of this Order.  Any corrective action timetable that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge.  The policies and procedures shall include, at a minimum:

(a)  appropriate oversight to ensure that Third-Party Providers comply with all applicable Legal Requirements, OCC supervisory guidance (including applicable portions of OCC Bulletin 2001-47), and the Bank's policies and procedures;

(b)  measures to ensure that all original records transferred from the Bank to Third-Party Providers (including the originals of promissory notes and mortgage documents) remain within the custody and control of the Third-Party Provider (unless filed with the

appropriate court or the loan is otherwise transferred to another party), and are returned to the Bank or designated custodians at the conclusion of the performed service, along with all other documents necessary for the Bank's files, and that the Bank retains imaged copies of significant documents sent to Third-Party Providers;

(c)  measures to ensure the accuracy of all documents filed or otherwise utilized on behalf of the Bank or the owners of mortgages in any judicial or non-judicial foreclosure proceeding, related bankruptcy proceeding, or in other foreclosure-related litigation, including, but not limited to, documentation sufficient to establish ownership of the promissory note and/or right to foreclose at the time the foreclosure action is commenced;

(d)  processes to perform appropriate due diligence on potential and current Third-Party Provider qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability, and to ensure adequacy of Third-Party Provider staffing levels, training, work quality, and workload balance;

(e)  processes to ensure that contracts provide for adequate oversight, including requiring Third-Party Provider adherence to Bank foreclosure processing standards, measures to enforce Third-Party Provider contractual obligations, and processes to ensure timely action with respect to Third-Party Provider performance failures;

(f)  processes to ensure periodic reviews of Third-Party Provider work for timeliness, competence, completeness, and compliance with all applicable Legal Requirements and supervisory guidance, and to ensure that foreclosures are conducted in a safe and sound manner;

(g)  processes to review customer complaints about Third-Party Provider services;

(h)  processes to prepare contingency and business continuity plans that ensure the continuing availability of critical third-party services and business continuity of the Bank, consistent with federal banking agency guidance, both to address short-term and long-term service disruptions and to ensure an orderly transition to new service providers should that become necessary;

(i)  a review of fee structures for Third-Party Providers to ensure that the method of compensation considers the accuracy, completeness, and legal compliance of foreclosure filings and is not based solely on increased foreclosure volume and/or meeting processing timelines; and

(j)  a certification process for law firms (and recertification of existing law firm providers) that provide residential mortgage foreclosure and bankruptcy services for the Bank, on a periodic basis, as qualified to serve as Third-Party Providers to the Bank including that attorneys are licensed to practice in the relevant jurisdiction and have the experience and competence necessary to perform the services requested.


ARTICLE VI

MORTGAGE ELECTRONIC REGISTRATION SYSTEM

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan to ensure appropriate controls and oversight of the Bank's activities with respect to the Mortgage Electronic Registration System ("MERS") and compliance with MERSCORP's membership rules, terms, and conditions ("MERS Requirements") ("MERS Plan").  The MERS Plan shall be implemented within one hundred twenty (120) days of this Order.  Any corrective action timetable that is in excess of one

hundred twenty (120) days must be approved by the Examiner-in-Charge.  The MERS Plan shall include, at a minimum:

(a)  processes to ensure that all mortgage assignments and endorsements with respect to mortgage loans serviced or owned by the Bank out of MERS' name are executed only by a certifying officer authorized by MERS and approved by the Bank;

(b)  processes to ensure that all other actions that may be taken by MERS certifying officers (with respect to mortgage loans serviced or owned by the Bank) are executed by a certifying officer authorized by MERS and approved by the Bank;

(c)  processes to ensure that the Bank maintains up-to-date corporate resolutions from MERS for all Bank employees and third-parties who are certifying officers authorized by MERS, and up-to-date lists of MERS certifying officers;

(d)  processes to ensure compliance with all MERS Requirements and with the requirements of the MERS Corporate Resolution Management System ("CRMS");

(e)  processes to ensure the accuracy and reliability of data reported to MERSCORP, including monthly system-to-system reconciliations for all MERS mandatory reporting fields, and daily capture of all rejects/warnings reports associated with registrations, transfers, and status updates on open-item aging reports.  Unresolved items must be maintained on open-item aging reports and tracked until resolution.  The Bank shall determine and report whether the foreclosures for loans serviced by the Bank that are currently pending in MERS' name are accurate and how many are listed in error, and describe how and by when the data on the MERSCORP system will be corrected; and

(f)  an appropriate MERS quality assurance workplan, which clearly describes all tests, test frequency, sampling methods, responsible parties, and the expected process for open-

item follow-up, and includes an annual independent test of the control structure of the system-to-system reconciliation process, the reject/warning error correction process, and adherence to the Bank's MERS Plan.

(2)  The Bank shall include MERS and MERSCORP in its third-party vendor management process, which shall include a detailed analysis of potential vulnerabilities, including information security, business continuity, and vendor viability assessments.


## ARTICLE VII

## FORECLOSURE REVIEW

(1)  Within forty-five (45) days of this Order, the Bank shall retain an independent consultant acceptable to the Deputy Comptroller and the Examiner-in-Charge to conduct an independent review of certain residential foreclosure actions regarding individual borrowers with respect to the Bank's mortgage servicing portfolio.  The review shall include residential foreclosure actions or proceedings (including foreclosures that were in process or completed) for loans serviced by the Bank, whether brought in the name of the Bank, the investor, the mortgage note holder, or any agent for the mortgage note holder (including MERS), that have been pending at any time from January 1, 2009 to December 31, 2010, as well as residential foreclosure sales that occurred during this time period ("Foreclosure Review").

(2)  Within fifteen (15) days of the engagement of the independent consultant described in this Article, but prior to the commencement of the Foreclosure Review, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge for approval an engagement letter that sets forth:

14

(a)  the methodology for conducting the Foreclosure Review, including: (i) a description of the information systems and documents to be reviewed, including the selection of criteria for cases to be reviewed; (ii) the criteria for evaluating the reasonableness of fees and penalties; (iii) other procedures necessary to make the required determinations (such as through interviews of employees and third parties and a process for submission and review of borrower claims and complaints); and (iv) any proposed sampling techniques.  In setting the scope and review methodology under clause (i) of this sub-paragraph, the independent consultant may consider any work already done by the Bank or other third-parties on behalf of the Bank.  The engagement letter shall contain a full description of the statistical basis for the sampling methods chosen, as well as procedures to increase the size of the sample depending on results of the initial sampling;

(b)  expertise and resources to be dedicated to the Foreclosure Review;

(c)  completion of the Foreclosure Review within one hundred twenty (120) days from approval of the engagement letter; and

(d) a written commitment that any workpapers associated with the Foreclosure Review shall be made available to the OCC immediately upon request.

(3)  The purpose of the Foreclosure Review shall be to determine, at a minimum:

(a)  whether at the time the foreclosure action was initiated or the pleading or affidavit filed (including in bankruptcy proceedings and in defending suits brought by borrowers), the foreclosing party or agent of the party had properly documented ownership of the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a proper party to the action as a result of agency or similar status;

15

Exhibit 13
Page000237

(b)  whether the foreclosure was in accordance with applicable state and federal law, including but not limited to the SCRA and the U.S. Bankruptcy Code;

(c)  whether a foreclosure sale occurred when an application for a loan modification or other Loss Mitigation was under consideration; when the loan was performing in accordance with a trial or permanent loan modification; or when the loan had not been in default for a sufficient period of time to authorize foreclosure pursuant to the terms of the mortgage loan documents and related agreements;

(d)  whether, with respect to non-judicial foreclosures, the procedures followed with respect to the foreclosure sale (including the calculation of the default period, the amounts due, and compliance with notice periods) and post-sale confirmations were in accordance with the terms of the mortgage loan and state law requirements;

(e)  whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary;

(f)  whether the frequency that fees were assessed to any delinquent borrower's account (including broker price opinions) was excessive under the terms of the borrower's loan documents, and applicable state and federal law;

(g)  whether Loss Mitigation Activities with respect to foreclosed loans were handled in accordance with the requirements of the HAMP, and consistent with the policies and procedures applicable to the Bank's proprietary loan modifications or other loss mitigation programs, such that each borrower had an adequate opportunity to apply for a Loss Mitigation option or program, any such application was handled properly, a final decision was made on a reasonable basis, and was communicated to the borrower before the foreclosure sale; and

(h)  whether any errors, misrepresentations, or other deficiencies identified in the Foreclosure Review resulted in financial injury to the borrower or the mortgagee.

(4)  The independent consultant shall prepare a written report detailing the findings of the Foreclosure Review ("Foreclosure Report"), which shall be completed within thirty (30) days of completion of the Foreclosure Review.  Immediately upon completion, the Foreclosure Report shall be submitted to the Deputy Comptroller, Examiner-in-Charge, and the Board.

(5)  Within forty-five (45) days of submission of the Foreclosure Report to the Deputy Comptroller, Examiner-in-Charge, and the Board, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge a plan, acceptable to the OCC, to remediate all financial injury to borrowers caused by any errors, misrepresentations, or other deficiencies identified in the Foreclosure Report, by:

(a)  reimbursing or otherwise appropriately remediating borrowers for impermissible or excessive penalties, fees, or expenses, or for other financial injury identified in accordance with this Article; and

(b)  taking appropriate steps to remediate any foreclosure sale where the foreclosure was not authorized as described in this Article.

(6)  Within sixty (60) days after the OCC provides supervisory non-objection to the plan set forth in paragraph (5) above, the Bank shall make all reimbursement and remediation payments and provide all credits required by such plan, and provide the OCC with a report detailing such payments and credits.

ARTICLE VIII

MANAGEMENT INFORMATION SYSTEMS

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy

Comptroller and the Examiner-in-Charge an acceptable plan for operation of its management

information systems ("MIS") for foreclosure and Loss Mitigation or loan modification activities

to ensure the timely delivery of complete and accurate information to permit effective decision-

making.  The MIS plan shall be implemented within one hundred twenty (120) days of this

Order.  Any corrective action timeframe that is in excess of one hundred twenty (120) days must

be approved by the Examiner-in-Charge.  The plan shall include, at a minimum:

(a)  a description of the various components of MIS used by the Bank for

foreclosure and Loss Mitigation or loan modification activities;

(b)  a description of and timetable for any needed changes or upgrades to:

(i)  monitor compliance with all applicable Legal Requirements and

supervisory guidance, and the requirements of this Order;

(ii)  ensure the ongoing accuracy of records for all serviced mortgages,

including, but not limited to, records necessary to establish ownership and the right to foreclose

by the appropriate party for all serviced mortgages, outstanding balances, and fees assessed to

the borrower; and

(iii)  measures to ensure that Loss Mitigation, loan foreclosure, and

modification staffs have sufficient and timely access to information provided by the borrower

regarding loan foreclosure and modification activities;

18

(c)  testing the integrity and accuracy of the new or enhanced MIS to ensure that reports generated by the system provide necessary information for adequate monitoring and quality controls.

## ARTICLE IX

## MORTGAGE SERVICING

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan, along with a timeline for ensuring effective coordination of communications with borrowers, both oral and written, related to Loss Mitigation or loan modification and foreclosure activities:  (i) to ensure that communications are timely and effective and are designed to avoid confusion to borrowers; (ii) to ensure continuity in the handling of borrowers' loan files during the Loss Mitigation, loan modification, and foreclosure process by personnel knowledgeable about a specific borrower's situation; (iii) to ensure reasonable and good faith efforts, consistent with applicable Legal Requirements, are engaged in Loss Mitigation and foreclosure prevention for delinquent loans, where appropriate; and (iv) to ensure that decisions concerning Loss Mitigation or loan modifications continue to be made and communicated in a timely fashion.  Prior to submitting the plan, the Bank shall conduct a review to determine whether processes involving past due mortgage loans or foreclosures overlap in such a way that they may impair or impede a borrower's efforts to effectively pursue a loan modification, and whether Bank employee compensation practices discourage Loss Mitigation or loan modifications.  The plan shall be implemented within one hundred twenty (120) days of this Order.  Any corrective action timeframe that is in excess of

one hundred twenty (120) days must be approved by the Examiner-in-Charge.  The plan shall

include, at a minimum:

(a)  measures to ensure that staff handling Loss Mitigation and loan modification

requests routinely communicate and coordinate with staff processing the foreclosure on the

borrower's property;

(b)  appropriate deadlines for responses to borrower communications and requests

for consideration of Loss Mitigation, including deadlines for decision-making on Loss Mitigation

Activities, with the metrics established not being less responsive than the timelines in the HAMP

program;

(c)  establishment of an easily accessible and reliable single point of contact for

each borrower so that the borrower has access to an employee of the Bank to obtain information

throughout the Loss Mitigation, loan modification, and foreclosure processes;

(d)  a requirement that written communications with the borrower identify such

single point of contact along with one or more direct means of communication with the contact;

(e)  measures to ensure that the single point of contact has access to current

information and personnel (in-house or third-party) sufficient to timely, accurately, and

adequately inform the borrower of the current status of the Loss Mitigation, loan modification,

and foreclosure activities;

(f)  measures to ensure that staff are trained specifically in handling mortgage

delinquencies, Loss Mitigation, and loan modifications;

(g)  procedures and controls to ensure that a final decision regarding a borrower's

loan modification request (whether on a trial or permanent basis) is made and communicated to

the borrower in writing, including the reason(s) why the borrower did not qualify for the trial or

permanent modification (including the net present value calculations utilized by the Bank, if applicable) by the single point of contact within a reasonable period of time before any foreclosure sale occurs;

(h)  procedures and controls to ensure that when the borrower's loan has been approved for modification on a trial or permanent basis that:  (i) no foreclosure or further legal action predicate to foreclosure occurs, unless the borrower is deemed in default on the terms of the trial or permanent modification; and (ii) the single point of contact remains available to the borrower and continues to be referenced on all written communications with the borrower;

(i)  policies and procedures to enable borrowers to make complaints regarding the Loss Mitigation or modification process, denial of modification requests, the foreclosure process, or foreclosure activities which prevent a borrower from pursuing Loss Mitigation or modification options, and a process for making borrowers aware of the complaint procedures;

(j)  procedures for the prompt review, escalation, and resolution of borrower complaints, including a process to communicate the results of the review to the borrower on a timely basis;

(k)  policies and procedures to ensure that payments are credited in a prompt and timely manner; that payments, including partial payments to the extent permissible under the terms of applicable legal instruments, are applied to scheduled principal, interest, and/or escrow before fees, and that any misapplication of borrower funds is corrected in a prompt and timely manner;

(l)  policies and procedures to ensure that timely information about Loss Mitigation options is sent to the borrower in the event of a delinquency or default, including plain language notices about loan modification and the pendency of foreclosure proceedings;

(m)  policies and procedures to ensure that foreclosure, Loss Mitigation, and loan modification documents provided to borrowers and third parties are appropriately maintained and tracked, and that borrowers generally will not be required to resubmit the same documented information that has already been provided, and that borrowers are notified promptly of the need for additional information; and

(n)  policies and procedures to consider loan modifications or other Loss Mitigation Activities with respect to junior lien loans owned by the Bank, and to factor the risks associated with such junior lien loans into loan loss reserving practices, where the Bank services the associated first lien mortgage and becomes aware that such first lien mortgage is delinquent or has been modified.  Such policies and procedures shall require the ongoing maintenance of appropriate loss reserves for junior lien mortgages owned by the Bank and the charge-off of such junior lien loans in accordance with FFIEC retail credit classification guidelines.

ARTICLE X

RISK ASSESSMENT AND RISK MANAGEMENT PLAN

(1)  Within ninety (90) days of this Order, the Bank shall conduct a written, comprehensive assessment of the Bank's risks in mortgage servicing operations, particularly in the areas of Loss Mitigation, foreclosure, and the administration and disposition of other real estate owned, including, but not limited to, operational, compliance, transaction, legal, and reputational risks.

(2)  The Bank shall develop an acceptable plan to effectively manage or mitigate identified risks on an ongoing basis, with oversight by the Bank's senior risk managers, senior

management, and the Board.  The assessment and plan shall be provided to the Deputy

Comptroller and the Examiner-in-Charge within one hundred twenty (120) days of this Order.


## ARTICLE XI

## APPROVAL, IMPLEMENTATION AND REPORTS

(1)  The Bank shall submit the written plans, programs, policies, and procedures required

by this Order for review and determination of no supervisory objection to the Deputy

Comptroller and the Examiner-in-Charge within the applicable time periods set forth in Articles

II through X.  The Bank shall adopt the plans, programs, policies, and procedures required by

this Order upon submission to the OCC, and shall immediately make any revisions requested by

the Deputy Comptroller or the Examiner-in-Charge.  Upon adoption, the Bank shall immediately

implement the plans, programs, policies, and procedures required by this Order and thereafter

fully comply with them.

(2)  During the term of this Order, the required plans, programs, policies, and procedures

shall not be amended or rescinded in any material respect without the prior written approval of

the Deputy Comptroller or the Examiner-in-Charge (except as otherwise provided in this Order).

(3)  During the term of this Order, the Bank shall revise the required plans, programs,

policies, and procedures as necessary to incorporate new or changes to applicable Legal

Requirements and supervisory guidelines.

(4)  The Board shall ensure that the Bank has processes, personnel, and control systems

to ensure implementation of and adherence to the plans, programs, policies, and procedures

required by this Order.

(5)  Within thirty (30) days after the end of each calendar quarter following the date of this Order, the Bank shall submit to the OCC a written progress report detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof.  The progress report shall include information sufficient to validate compliance with this Order, based on a testing program acceptable to the OCC that includes, if required by the OCC, validation by third-party independent consultants acceptable to the OCC.  The OCC may, in writing, discontinue the requirement for progress reports or modify the reporting schedule.

(6)  All communication regarding this Order shall be sent to:

    (a)  Vance S. Price
       Deputy Comptroller
       Large Bank Supervision
       Office of the Comptroller of the Currency
       250 E Street, SW
       Washington, DC 20219

    (b)  John C. Lyons
       Examiner-in-Charge
       National Bank Examiners
       880 Third Avenue, 5th Floor,
       New York, NY, 10022-4730

## ARTICLE XII

## COMPLIANCE AND EXTENSIONS OF TIME

(1)  If the Bank contends that compliance with any provision of this Order would not be feasible or legally permissible for the Bank, or requires an extension of any timeframe within this Order, the Board shall submit a written request to the Deputy Comptroller asking for relief.  Any written requests submitted pursuant to this Article shall include a statement setting forth in detail the special circumstances that prevent the Bank from complying with a provision, that require

the Deputy Comptroller to exempt the Bank from a provision, or that require an extension of a timeframe within this Order.

(2)  All such requests shall be accompanied by relevant supporting documentation, and to the extent requested by the Deputy Comptroller, a sworn affidavit or affidavits setting forth any other facts upon which the Bank relies.  The Deputy Comptroller's decision concerning a request is final and not subject to further review.


.ARTICLE XIII

OTHER PROVISIONS

(1)  Although this Order requires the Bank to submit certain actions, plans, programs, policies, and procedures for the review or prior written determination of no supervisory objection by the Deputy Comptroller or the Examiner-in-Charge, the Board has the ultimate responsibility for proper and sound management of the Bank.

(2)  In each instance in this Order in which the Board is required to ensure adherence to, and undertake to perform certain obligations of the Bank, it is intended to mean that the Board shall:

(a)  authorize and adopt such actions on behalf of the Bank as may be necessary for the Bank to perform its obligations and undertakings under the terms of this Order;

(b)  require the timely reporting by Bank management of such actions directed by the Board to be taken under the terms of this Order;

(c)  follow-up on any material non-compliance with such actions in a timely and appropriate manner; and

(d)  require corrective action be taken in a timely manner of any material non-compliance with such actions.

(3)  If, at any time, the Comptroller deems it appropriate in fulfilling the responsibilities placed upon him by the several laws of the United States to undertake any action affecting the Bank, nothing in this Order shall in any way inhibit, estop, bar, or otherwise prevent the Comptroller from so doing.

(4)  This Order constitutes a settlement of the cease and desist proceeding against the Bank contemplated by the Comptroller, based on the unsafe or unsound practices described in the Comptroller's Findings set forth in Article I of this Order.  Provided, however, that nothing in this Order shall prevent the Comptroller from instituting other enforcement actions against the Bank or any of its institution-affiliated parties, including, without limitation, assessment of civil money penalties, based on the findings set forth in this Order, or any other findings.

(5)  This Order is and shall become effective upon its execution by the Comptroller, through his authorized representative whose hand appears below.  The Order shall remain effective and enforceable, except to the extent that, and until such time as, any provision of this Order shall be amended, suspended, waived, or terminated in writing by the Comptroller.

(6)  Any time limitations imposed by this Order shall begin to run from the effective date of this Order, as shown below, unless the Order specifies otherwise.

(7)  The terms and provisions of this Order apply to the Bank and its subsidiaries, even though those subsidiaries are not named as parties to this Order.  The Bank shall integrate any foreclosure or mortgage servicing activities done by a subsidiary into its plans, policies, programs, and processes required by this Order.  The Bank shall ensure that its subsidiaries comply with all terms and provisions of this Order.

26

(8)  This Order is intended to be, and shall be construed to be, a final order issued

pursuant to 12 U.S.C. § 1818(b), and expressly does not form, and may not be construed to form,

a contract binding the Comptroller or the United States.  Nothing in this Order shall affect any

action against the Bank or its institution-affiliated parties by a bank regulatory agency, the

United States Department of Justice, or any other law enforcement agency, to the extent

permitted under applicable law.

(9)  The terms of this Order, including this paragraph, are not subject to amendment or

modification by any extraneous expression, prior agreements, or prior arrangements between the

parties, whether oral or written.

(10)  Nothing in the Stipulation and Consent or this Order, express or implied, shall give

to any person or entity, other than the parties hereto, and their successors hereunder, any benefit

or any legal or equitable right, remedy or claim under the Stipulation and Consent or this Order.

(11)  The Bank consents to the issuance of this Order before the filing of any notices, or

taking of any testimony or adjudication, and solely for the purpose of settling this matter without

a formal proceeding being filed.

IT IS SO ORDERED, this 13th day of April, 2011.


____/s/_____
Vance S. Price
Deputy Comptroller
Large Bank Supervision

27

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**COMPTROLLER OF THE CURRENCY**

_____ )
                                                )
**In the Matter of:**                           )
Citibank, N.A.                                  )       AA-EC-11-13
Las Vegas, Nevada                               )
                                                )
_____ )

**STIPULATION AND CONSENT TO THE ISSUANCE**
**OF A CONSENT ORDER**

The Comptroller of the Currency of the United States of America ("Comptroller")

intends to impose a cease and desist order on Citibank, N.A., Las Vegas, Nevada

("Bank") pursuant to 12 U.S.C. § 1818(b), for unsafe or unsound banking practices

relating to mortgage servicing and the initiation and handling of foreclosure proceedings.

The Bank, in the interest of compliance and cooperation, enters into this

Stipulation and Consent to the Issuance of a Consent Order ("Stipulation") and consents

to the issuance of a Consent Order, dated April 13, 2011 ("Consent Order");

In consideration of the above premises, the Comptroller, through his authorized

representative, and the Bank, through its duly elected and acting Board of Directors,

stipulate and agree to the following:

ARTICLE I
JURISDICTION

(1)     The Bank is a national banking association chartered and examined by the

Comptroller pursuant to the National Bank Act of 1864, as amended, 12 U.S.C. § 1 *et*

*seq.*

(2)      The Comptroller is "the appropriate Federal banking agency" regarding the Bank pursuant to 12 U.S.C. §§ 1813(q) and 1818(b).

(3)      The Bank is an "insured depository institution" within the meaning of 12 U.S.C. § 1818(b)(1).

(4)      For the purposes of, and within the meaning of 12 C.F.R. §§ 5.3(g)(4), 5.51(c)(6), and 24.2(e)(4), this Consent Order shall not be construed to be a "cease and desist order" or "consent order", unless the OCC informs the Bank otherwise.

## ARTICLE II
## AGREEMENT

(1)      The Bank, without admitting or denying any wrongdoing, consents and agrees to issuance of the Consent Order by the Comptroller.

(2)      The Bank consents and agrees that the Consent Order shall (a) be deemed an "order issued with the consent of the depository institution" pursuant to 12 U.S.C. § 1818(h)(2), (b) become effective upon its execution by the Comptroller through his authorized representative, and (c) be fully enforceable by the Comptroller pursuant to 12 U.S.C. § 1818(i).

(3)      Notwithstanding the absence of mutuality of obligation, or of consideration, or of a contract, the Comptroller may enforce any of the commitments or obligations herein undertaken by the Bank under his supervisory powers, including 12 U.S.C. § 1818(i), and not as a matter of contract law.  The Bank expressly acknowledges that neither the Bank nor the Comptroller has any intention to enter into a contract.

(4)     The Bank declares that no separate promise or inducement of any kind has been made by the Comptroller, or by his agents or employees, to cause or induce the Bank to consent to the issuance of the Consent Order and/or execute the Consent Order.

(5)     The Bank expressly acknowledges that no officer or employee of the Comptroller has statutory or other authority to bind the United States, the United States Treasury Department, the Comptroller, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the Comptroller's exercise of his supervisory responsibilities.

(6)     The OCC releases and discharges the Bank from all potential liability for a cease and desist order that has been or might have been asserted by the OCC based on the banking practices described in the Comptroller's Findings set forth in Article I of the Consent Order, to the extent known to the OCC as of the effective date of the Consent Order.  However, the banking practices alleged in Article I of the Consent Order may be utilized by the OCC in other future enforcement actions against the Bank or its institution-affiliated parties, including, without limitation, to assess civil money penalties or to establish a pattern or practice of violations or the continuation of a pattern or practice of violations.  This release shall not preclude or affect any right of the OCC to determine and ensure compliance with the terms and provisions of this Stipulation or the Consent Order.

(7)     The terms and provisions of the Stipulation and the Consent Order shall be binding upon, and inure to the benefit of, the parties hereto and their successors in interest.  Nothing in this Stipulation or the Consent Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any

benefit or any legal or equitable right, remedy or claim under this Stipulation or the
Consent Order.

## ARTICLE III
## WAIVERS

(1)      The Bank, by consenting to this Stipulation, waives:

(a)      the issuance of a Notice of Charges pursuant to 12 U.S.C.
§ 1818(b);

(b)      any and all procedural rights available in connection with the
issuance of the Consent Order;

(c)      all rights to a hearing and a final agency decision pursuant to 12
U.S.C. §§ 1818(b) and (h), 12 C.F.R. Part 19;

(d)      all rights to seek any type of administrative or judicial review of
the Consent Order;

(e)      any and all claims for fees, costs or expenses against the
Comptroller, or any of his agents or employees, related in any way to this enforcement
matter or this Consent Order, whether arising under common law or under the terms of
any statute, including, but not limited to, the Equal Access to Justice Act, 5 U.S.C. § 504
and 28 U.S.C. § 2412; and

(f)      any and all rights to challenge or contest the validity of the
Consent Order.

4

ARTICLE IV
OTHER PROVISIONS

(1)     The provisions of this Stipulation shall not inhibit, estop, bar, or otherwise

prevent the Comptroller from taking any other action affecting the Bank if, at any time, it

deems it appropriate to do so to fulfill the responsibilities placed upon it

by the several laws of the United States of America.

(2)     Nothing in this Stipulation shall preclude any proceedings brought by the

Comptroller to enforce the terms of this Consent Order, and nothing in this Stipulation

constitutes, nor shall the Bank contend that it constitutes, a waiver of any right, power, or

authority of any other representative of the United States or an agency thereof, including,

without limitation, the United States Department of Justice, to bring other actions deemed

appropriate.

(3)     The terms of the Stipulation and the Consent Order are not subject to

amendment or modification by any extraneous expression, prior agreements or prior

arrangements between the parties, whether oral or written.


        IN TESTIMONY WHEREOF, the undersigned, authorized by the Comptroller as

his representative, has hereunto set his hand on behalf of the Comptroller.


/s/                                                     April 13, 2011
_____                 _____
Vance S. Price                                          Date
Deputy Comptroller
Large Bank Supervision


5

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting

Board of Directors of the Bank, have hereunto set their hands on behalf of the Bank.


___/s/_____                    _____*March 29, 2011*_____
Timothy C. Collins                          Date


___/s/_____                    ___*March 29, 2011*_____
Jerry A. Grundhofer                         Date


___/s/_____                    ___*March 29, 2011*_____
Robert L. Joss                              Date


___/s/_____                    ___*March 29, 2011*_____
Eugene M. McQuade                           Date


___/s/_____                    ___*March 29, 2011*_____
Michael E. O'Neill                          Date


___/s/_____                    ___*3/29/11*_____
Lawrence R. Ricciardi                       Date


___/s/_____                    ___*March 27, 2011*_____
Robert L. Ryan                              Date


___/s/_____                    ___*3/29/11*_____
Anthony M. Santomero                        Date

6

___/s/_____          __*March 29, 2011*_____
Ernesto Zedillo                 Date

7