1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                         NORTHERN DISTRICT OF CALIFORNIA

9   GLORIA STITT, *et al.*,                    Case No.: 12-cv-03892- YGR

10           Plaintiffs,                        ORDER DENYING PLAINTIFFS' MOTION FOR
                                                ORDER OF ENTITLEMENT TO CATALYST FEE
11      vs.                                     AWARD UNDER CAL. CODE CIV. P. § 1021.5

12  CITIBANK, NATIONAL ASSOCIATION AND          Re: Dkt. No. 176
13  CITIMORTGAGE, INC.,

14           Defendants.

15       Now before the Court is a motion by plaintiffs Gloria Stitt, Ronald Stitt, Mark Zirlott, and

16  Teri Zirlott seeking an order entitling them to a catalyst fee award of attorneys' fees under Cal. Code

17  Civ. P. section 1021.5.  (Dkt. No. 176.)[1]  Defendants CitiBank National Association and

18  CitiMortgage, Inc. (collectively, "Citi") oppose.   Having carefully considered the papers submitted

19  and the pleadings in this action, oral argument held on July 19, 2016, and for the reasons set forth

20  below, the Court hereby DENIES plaintiffs' motion.

21    I.      BACKGROUND

22       Citi has acted as a home mortgage loan servicer for millions of borrowers nationwide.  In that

23  capacity, Citi is responsible for providing certain services to protect the mortgage lenders' interests in

24  the property securing the underlying loan.  Among those services are property inspections, which Citi

25  orders to inspect the property when a borrower goes into default on payments.

26

27       _____
         [1]  The Court resolves the administrative motions to seal documents submitted in connection
28  with the substantive motion through separate orders entered this date.

United States District Court
Northern District of California

1    On April 4, 2012, a federal judge entered a consent judgment, the National Mortgage

2  Settlement, between Citi and the federal government, 49 States, and the District of Columbia.  (Dkt.

3  No. 185-16, the "NMS.")  The entities filed a federal lawsuit arising out of the national mortgage

4  crisis against Citi for violations of various state and federal laws in the servicing of home mortgage

5  loans, including: unfair and deceptive acts and practices laws of the various States, the federal False

6  Claims Act, and bankruptcy laws.  (*Id*. at 3.)  Pursuant to the NMS, Citi agreed to pay a monetary

7  penalty of more than $400 million.  (*Id*. at 4.)  Citi further committed to achieve certain servicing

8  standards and reforms as part of the NMS.  (*Id*. at 12.)  The servicing standards imposed by the NMS

9  concerned, *inter alia*, the frequency with which property inspection fees may be charged to a

10  delinquent borrower and the circumstances under which Citi could charge delinquent borrowers for

11  reasonable and appropriate default-related fees under the terms of their agreements.  (*Id*. at 12–13.)

12  The NMS further specified that servicer guidelines would govern Citi's charging behavior: "No

13  property inspection fee shall be imposed on a borrower any more frequently than the timeframes

14  allowed under GSE or HUD guidelines," subject to a limited exception.  (*Id*. at 13.)

15    Two days after Citi entered into the NMS, plaintiffs filed the instant lawsuit.[2]  Their

16  complaint contained allegations on behalf of a nationwide class challenging Citi's assessment against

17  delinquent borrowers for property inspections[3] allegedly marked-up from the cost Citi paid its third-

18  party vendors for the service.  (Dkt. No. 1 ¶ 2.)  Plaintiffs included causes of action for violation of

19  the Racketeer Influenced and Corrupt Organizations Act ("RICO"), conspiracy to violate RICO,

20  fraud, and unjust enrichment.  (*See id.*)  While the complaint did include allegations of purportedly

21  "unnecessary" fees, the gravamen of plaintiffs' complaint was Citi's alleged mark-up profit hidden in

22

23    ───────────────

  [2]  On April 6, 2012, plaintiffs originally asserted their claims against Citi in *Bias v. Wells

24  Fargo*, 12-cv-664-YGR.  That case accused Citi as well as two other sets of bank defendants of
  similar conduct in connection with servicing home mortgage loans.  On July 13, 2012, the Court

25  severed the defendant banks and directed plaintiffs to file their claims against Citi in a separate
  action.  On July 24, 2012, plaintiffs filed this action against Citi only.  (*See* Dkt. No. 1.)

26    [3]  Plaintiffs' complaint and first amended complaint also alleged the same conduct with

27  respect to Broker Price Opinions ("BPOs").  (*See* Dkt. Nos. 1, 69.)  Plaintiffs have since dropped
  their claims concerning BPOs entirely and do not argue they were the catalyst in any change to Citi's

28  BPO policies.

1   the property inspection fee amounts assessed to borrowers' accounts.  Citi moved to dismiss on

2   various pleading grounds.  (Dkt. No. 5.)

3          On April 25, 2013, the Court issued an order granting Citi's motion to dismiss the RICO

4   claims but denying the motion with respect to the fraud and unjust enrichment claims.  (Dkt. No. 21.)

5   The Court allowed plaintiffs' claims for fraud and unjust enrichment to proceed chiefly based upon

6   plaintiffs' allegations that Citi fraudulently inflated the cost of inspection fees assessed to delinquent

7   borrowers and in some instances charged them for inspections that never occurred, *i.e.* the mark-up

8   allegations.  (*See id.* at 18–22.)[4]

9          Approximately six weeks later, on June 1, 2013, Citi suspended its practice of charging

10  borrowers for property inspection fees altogether while it modified its computer system logic.  (Dkt.

11  No. 175-8 at 17.)  Before June 1, 2013, Citi's policy was to assess all property inspection fees to

12  delinquent borrowers.  (*Id.* at 15.)[5]  Between June 1 and mid-August 2013, Citi developed a more

13  complex logic to determine when property inspection fees would be charged to the borrower.  (*Id.*)

14  This logic was designed to take into account GSE and servicer guidelines for when a borrower may

15  be assessed for a fee.  (Dkt. No. 185-3)  Then, in August 2013, Citi resumed assessing borrowers for

16  property inspection fees according to the new logic.  (Dkt. No. 175-8 at 17.)  Citi made two

17  additional changes to the logic in 2014.  (*Id.* at 18.)

18          Plaintiffs now argue their lawsuit was the catalyst for Citi's changes to its property inspection

19  fee charging practices beginning in June 2013.  Based thereon, plaintiffs seek an order entitling them

20  to attorneys' fees as a reward for forcing Citi to change its conduct to the benefit of all borrowers

21  whose mortgages Citi services.  Citi opposes, maintaining its conduct did not change in response to

22  plaintiffs' lawsuit.  Citi submits evidence tending to show it was changing its practices to come into

23  compliance with the NMS prior to the Court's order denying in part its motion to dismiss.  Moreover,

24  Citi argues plaintiffs could not have been the catalyst for the changes because plaintiffs were not yet

25

26          [4]  The Court recognized in a footnote that, when construed liberally in favor of plaintiffs, the
    complaint also challenged the frequency with which Citi charged borrowers for property inspection
27  fees.  (*See id.* at 9, n. 4.)

28          [5]  This policy did not apply to inspection fees for properties in West Virginia or Maryland.
    (Dkt. No. 175-8 at 15.)

United States District Court
Northern District of California

challenging the manner in which Citi assessed property inspection fees to borrowers in mid-2013.

## II.    CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1021.5

### A.  Legislative History

Under the traditional American Rule, attorneys' fees are not ordinarily recoverable by a prevailing party in litigation. *See Alyeska Pipeline Svc. Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975); *Graham v. DaimlerChrysler Corp.*, 34 Cal.4th 553, 565 (2004). Exceptions exist. Of course, parties can enter into agreements which provide for the award of attorneys' fees should a dispute arise. Legislative bodies can enact specific exceptions to the general rule to allow an award of attorneys' fees to prevailing parties under certain federal and state statutes. *See Serrano v. Priest ("Serrano III")*, 20 Cal.3d 25, 34 (1977). In the mid-Twentieth Century, California and federal courts alike fashioned a judicial exception to the America Rule known as the "private attorney general" doctrine. *Alyeska*, 240 U.S. at 267; *Woodland Hills Residents Ass'n v. City Council of Los Angeles*, 23 Cal.3d 917, 928 (1979).

In 1977, the United States Supreme Court held that federal courts did not have the equitable power to invoke the private attorney general doctrine on behalf of plaintiffs absent specific congressional authorization. *Alyeska*, 420 U.S. at 269 (federal courts "are not free to fashion drastic new rules with respect to the allowance of attorneys' fees to the prevailing party in federal litigation . . . .") Two years later, in *Serrano III*, California courts parted ways with the federal rule when the California Supreme Court held that the private attorney general doctrine was appropriately invoked, "[i]f as a result of the efforts of plaintiffs' attorneys rights created or protected by the State Constitution are protected to the benefit of a large number of people." 20 Cal.3d at 46. The rationale for upholding the private attorney general doctrine was explained by the California Supreme Court:

> In the complex society in which we live it frequently occurs that citizens in great numbers and across a broad spectrum have interests in common. These, while of enormous significance to the society as a whole, do not involve the fortunes of a single individual to the extent necessary to encourage their private vindication in the courts. Although there are within the executive branch of the government offices and institutions (exemplified by the Attorney General) whose function it is to represent the general public in such matters and to ensure proper enforcement, for various reasons the burden of enforcement is not always adequately carried by those offices and institutions, rendering

United States District Court
Northern District of California

some sort of private action imperative. Because the issues involved in such litigation are often extremely complex and their presentation time-consuming and costly, the availability of representation of such public interests by private attorneys acting *pro bono publico* is limited. Only through the appearance of "public interest" law firms funded by public and foundation monies, argue plaintiffs and amici, has it been possible to secure representation on any large scale. The firms in question, however, are not funded to the extent necessary for the representation of all such deserving interests, and as a result many worthy causes of this nature are without adequate representation under present circumstances. One solution, so the argument goes, within the equitable powers of the judiciary to provide, is the award of substantial attorneys fees to those public-interest litigants and their attorneys (whether private attorneys acting *pro bono publico* or members of "public interest" law firms) who are successful in such cases, to the end that support may be provided for the representation of interests of similar character in future litigation.

*Serrano III*, 20 Cal.3d at 44.  The California Supreme Court declined to "address the question as to whether courts may award attorney fees under the 'private attorney general' theory, where the litigation at hand has vindicated a public policy having a statutory, as opposed to, a constitutional basis." *Id*. at 47.

Section 1021.5 of the California Code of Civil Procedure went into effect less than three months after *Serrano III*.  *See Woodland Hills*, 23 Cal.3d at 925, n.1.  Section 1021.5 provides the "explicit statutory authority for court-awarded attorney fees under a private attorney general theory" where the lawsuit "has resulted in the enforcement of an important right affecting the public interest regardless of its source – constitutional, statutory or other."  *Id*. at 925 (quoting Cal. Code Civ. P. 1021.5) (internal quotations and emphasis omitted).  Section 1021.5 recognizes that "privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible."  *Graham*, 34 Cal.4th at 565 (quoting *Maria P. v. Riles*, 43 Cal.3d 1281, 1288–89 (1987)).  At the same time, compensation under the private attorney general doctrine is not always appropriate even where important public rights are at stake.  Instead, whether plaintiffs are entitled to such an award turns on "a comparison of the litigant's private interests with the anticipated costs of suit."  *Cal. Licensed Foresters Ass'n v. State Bd. of Forestry*, 30 Cal.App.4th 562, 570

5

1    (1994).  This balance is necessary to effectuate the intent of Section 1021.5 "as a 'bounty' for

2    pursuing public interest litigation, not a reward for litigants motivated by their own interests who

3    coincidentally serve the public."  *Id*.

4    **B.  Requirements Under Section 1021.5**

5    Pursuant to Section 1021.5 trial courts have discretion to award attorneys' fees to, *inter alia*:
[1] a *successful* party against one or more opposing parties, [2] in any
action which has resulted in the enforcement of an important right
affecting the public interest, if [3] a significant benefit, whether
pecuniary or nonpecuniary, has been conferred on the general public or
a large class of persons, [4] the necessity and financial burden of
private enforcement . . . are such as to make the award appropriate . . . .

9    Cal. Code Civ. P. § 1021.5 (emphasis supplied).  With respect to the first factor, *i.e.* whether the

10   moving party has been successful, formal judicial relief need not have been secured through the

11   litigation.  *Graham*, 34 Cal.4th at 565 (the California Supreme Court has "taken a broad, pragmatic

12   view of what constitutes a 'successful party'").  Rather, in determining whether a plaintiff is a

13   "successful party," the court "must realistically assess the litigation and determine, from a practical

14   perspective, whether or not the action served to vindicate an important right so as to justify an

15   attorney fee award under section 1021.5."  *Id*. at 566 (internal quotations omitted).  "The critical fact

16   is the impact of the action, not the manner of its resolution."  *Folsom v. Butte Cty. Ass'n of Gov'ts*, 32

17   Cal.3d 668, 686 (1982).

18   Relevant here, California recognizes the "catalyst theory" by which a plaintiff may be deemed

19   successful within the meaning of Section 1021.5 "when it achieves its litigation objectives by means

20   of defendant's 'voluntary' change in conduct in response to the litigation."  *Graham*, 34 Cal.4th at

21   572.  In affirming the catalyst theory, the California Supreme Court emphasized that the utility of the

22   catalyst theory is to lessen the "considerable risk" of not being paid that public interest attorneys

23   assume each time they take on a case.  *Id*. at 574.  The court also recognized a risk that the catalyst

24   theory may encourage frivolous litigation.  *Id*. at 575.  The court therefore adopted a three-pronged

25   test to balance these competing interests.  *Id*.  To be entitled to fees under Section 1021.5 under a

26   catalyst theory, a plaintiff must show:

(1) the lawsuit was a catalyst motivating defendants to provide the
primary relief sought; (2) that the lawsuit had merit and achieved its
catalytic effect by threat of victory, not by dint of nuisance and threat of

expense . . .; and (3) that the plaintiffs reasonably attempted to settle the litigation prior to filing the lawsuit.

*Tipton-Whittingham v. City of Los Angeles*, 34 Cal.4th 604, 608 (2004) (citing *Graham*, *supra*).  This test requires there must not only be a causal connection between the lawsuit and the relief obtained, but also a determination by the trial court that the relief obtained was required by law.  *Graham*, 34 Cal.4th at 575.  The trial court should review the pleadings and evidence "not only to determine the lawsuit's catalytic effect but also its merits."  *Id*. at 576.

"To be a catalyst, the lawsuit must have been 'a substantial causal factor' contributing to Defendant's conduct, though the lawsuit need not be the only cause of Defendant's conduct."  *Henderson v. J.M. Smucker Co.*, 2013 WL 3146774, at *4 (C.D. Cal. June 19, 2013) (quoting *Graham*, 34 Cal.4th at 573)).   Because "it can be difficult to prove causation" under a catalyst theory, California law allows an inference of causation where the change in the defendant's conduct occurs after the filing of the lawsuit.  *Californians for Responsible Toxics Mgt. v. Kizer*, 211 Cal.App.3d 961, 968 (1989).  "When action is taken by the defendant after plaintiff's lawsuit is filed the chronology of events may permit the inference that the two events are causally related."  *Id*.  To determine whether such an inference arises, a trial court should look to "(a) the situation immediately prior to the commencement of suit, and (b) the situation today, and the role, if any, played by the litigation in effecting any changes between the two."  *Hogar v. Community Dev. Comm. of the City of Escondido*, 157 Cal.App.4th 1358, 1366 (2008) (quoting *Folsom*, 32 Cal.3d at 685, n. 31).

If plaintiffs raise an inference of causation, the burden shifts to defendants to offer rebuttal evidence.  *Kizer*, 211 Cal.App.3d at 968.  The trial court then "weighs the credibility of the evidence, although remaining mindful that defendants, on the whole, are usually rather reluctant to concede that the litigation prompted them to mend their ways."  *MacDonald v. Ford Motor Co.*, 142 F. Supp. 3d 884, 891 (N.D. Cal. 2015) (internal quotations and citations omitted).  An inference of causation "raised solely by the chronology of events" can be rebutted by credible evidence of the non-litigation genesis of the change in conduct.  *Kizer*, 211 Cal.App.3d at 969.

Trial courts are entrusted with the responsibility to exercise their discretion in determining whether plaintiffs were a "successful party" notwithstanding their inability to secure a judicial victory.  *See Graham*, 34 Cal.4th at 575.  To be sure, "trial court judges close to and familiar with the

7

1  litigation" are best suited to resolve competently whether a party has been successful. *Id*. at 573.

2  **III.  ANALYSIS**

3  The only disputed factor under Section 1021.5 is whether plaintiffs are a "successful party."[6]

4  Plaintiffs argue that the Court's order largely denying Citi's motion to dismiss in April 2013 induced

5  Citi to modify its processing logic to determine when to assess a borrower for a property inspection

6  fee. Plaintiffs rely on chronology to argue an inference should arise that this lawsuit was the catalyst[7]

7  causing Citi to change its behavior voluntarily. Citi opposes, arguing it began working to change its

8  property inspection policy in response to the NMS in 2012, even before the filing of the lawsuit.

9  Citi maintains the changes were not made in response to the Court's denial of its motion to dismiss.

10  For the following reasons, the Court finds that plaintiffs are not entitled to an inference of causation

11  and, regardless, Citi has presented evidence sufficient to rebut such an inference.

12  The principal deficiency in plaintiffs' chronology is their failure to tie the "primary relief

13  sought" in the litigation, on the one hand, to Citi's change in conduct, on the other. *See Tipton-*

14  *Whittingham*, 34 Cal.4th at 608 (plaintiffs must establish their lawsuit "motivate[d] the defendant to

15  provide the primary relief sought"). The catalyst theory rests on the notion that "[a]t the very least, a

16  plaintiff must establish the precise factual/legal condition that [it] sought to change or affect as a

17  prerequisite for establishing the catalytic effect of its lawsuit." *Graham*, 34 Cal.4th at 576 (internal

18  quotations omitted). The premise requires plaintiffs to show they sought a specific change, Citi made

19  that change, and Citi did so substantially in response to plaintiffs' lawsuit.

20

21  [6]  As a threshold issue, Citi argues that Section 1021.5 does not apply here because non-

22  California plaintiffs brought claims against non-California defendants for violation of the laws of
New York and Alabama based on conduct occurring outside of California. No party was able to cite

23  a case addressing this precise issue: whether Section 1021.5 applies where the lawsuit's only
connection to California is a federal district court sitting in diversity in California. Finding that

24  plaintiffs otherwise are not successful parties entitled to an award under Section 1021.5, the Court
declines to resolve whether these non-California plaintiffs can even invoke Section 1021.5.

25  [7]  Plaintiffs argue improperly in their reply brief that Citi can rebut the chronological

26  inference of causation only upon a showing that the litigation had "no impact" on their decision to
change their policy. (*See* Dkt. No. 189 at 5:6; *id.* at 9:8.) This is not the law. Certainly the inference

27  is rebutted where a defendant proves "the filing of the suit had no impact on its action," but that does
not affect the ultimate standard of proof. *See Californians for Responsible Toxics Mgt.*, 211

28  Cal.App.3d at 968. Even with the benefit of an inference of causation, plaintiffs must still show their
lawsuit was a "substantial factor" in Citi's voluntary change in behavior. *Graham*, 34 Cal.4th at 573.

United States District Court
Northern District of California

Here, the record shows that the primary relief sought by plaintiffs in mid-2013 was not how Citi determined when to assess property inspection fees to borrowers. Rather, in opposition to Citi's motion, plaintiffs summarized their "relatively simple and straightforward" theory as:

> [T]he Citi Defendants devised and employed a practice of utilizing automated mortgage loan servicing systems to mark-up or pad certain default-related fees charged by third parties, *i.e.* inspection fees . . ., and then concealed those marked-up or padded fees in statements submitted to borrowers.
>
> ....
>
> [Citi] obtained default-related services from third-party vendors, inflated the costs charged by such third-party vendors, over 100% or more . . . .

(Dkt. No. 7 at 6:24–7:12.) Indeed, plaintiffs explicitly disavowed bringing a challenge to the appropriateness of when Citi assessed borrowers for property inspection fees. Thus:

> Here, plaintiffs *do not* ask this Court to determine how much an appropriate . . . inspection fee should be, nor do they challenge [Citi's] ability to charge a[n] . . . inspection fee. . . . [Here, Citi] uniformly, routinely and repeatedly inflate the third-party costs they incurred in connection with inspecting and valuing a property, and they asses such inflated costs to borrowers.

(*Id*. at 12:8–18) (emphasis in original). At the November 6, 2012 hearing on Citi's motion, plaintiffs' counsel represented to the Court that this case was unconcerned with the frequency of the inspections. (*See* Dkt. No. 20 at 56–58.) Plaintiffs' counsel represented during the same hearing in no uncertain terms that plaintiffs' case was based on the allegation that "every time [Citi] charged a fee, the amount was wrong. Every time." (*Id*. at 58:7–8.)[8]

---

[8] The full exchange between the Court and plaintiffs' counsel, in relevant part:

| | |
|---|---|
| The Court: | One could argue that the conduct of charging [for default-related fees] every 20 days was inappropriate. |
| Mr. Tellis: | Yes. That is not our case. We could care less when they were charged. I don't say that - - I mean, we do care - - |

. . . .

| | |
|---|---|
| The Court: | Does the complaint allege that the frequency of intervals was inappropriate? |
| Mr. Tellis: | No. The complaint alleged every time they charge a fee, the amount was wrong. |

. . . .

| | |
|---|---|
| The Court: | If [Citi] had charged $50 every interval period, whether or not that was 20 days or 30 days, or ten days, or 50 days, who cares, every time they charged $50 . . . then that would be fine with you? |
| Mr. Tellis: | It wouldn't be fine with me, but that's a different case. . . . |

Based upon the Court's review of plaintiffs' complaint, the briefing on Citi's motion to dismiss, and the transcript of the hearing on Citi's motion, the Court finds that plaintiffs primarily sought to end the alleged practice of mark-up on property inspection fees. Plaintiffs explicitly disclaimed the notion they were challenging the manner or frequency of property inspection fee charges. (*See* Dkt. No. 7 at 12:8–18.) Only when discovery revealed that Citi did not add a mark-up to property inspection fees did plaintiffs change course and primarily pursue their current theory, *i.e.* that Citi "intentionally ignored [the] explicit instructions [from GSE's] and programmed their automated loan servicing system to order inspections, irrespective of the circumstances of a particular loan." (Dkt. No. 113-1 at 8:21–25.) Tellingly, this quoted summary plaintiffs employ to support the proposition that this theory was prominent throughout the litigation is taken from their motion for class certification – filed June 9, 2015. (*See* Dkt. No. 113.) Consequently, plaintiffs have not supported their assertion that the central focus of the litigation in mid-2013 was to change Citi's policy of assessing property inspection fees without reviewing the circumstances of each mortgage individually. Plaintiffs are not entitled to an inference of causation. This alone warrants a finding plaintiffs are not a successful party within the meaning of Section 1021.5.

Moreover, Citi presents contemporaneous evidence tending to show the changes were made to comply with provisions of the NMS – not in response to this lawsuit. *C.f. MacDonald*, 142 F. Supp. 3d at 894 (finding insufficient contemporaneous evidence to rebut the inference of causation from the chronology of events). Because the NMS was approved just two days before plaintiffs filed their lawsuit, plaintiffs try to shift the focus away from the nearly concurrent timing of the NMS and the complaint and to the timing of the Court's order denying in part Citi's motion to dismiss in April 2013. Yet as early as February 2012 (two months before plaintiffs initiated this lawsuit) Citi created an internal document entitled "NMS – Servicing Standards," which stated Citi planned to "redefine the logic for passing property inspections fee[s] to borrowers" to ensure compliance with investor guidelines. (Dkt. No. 185-2.) And on April 12, 2013, thirteen days before the Court's order issued, the Citi employee who oversaw the NMS changes sent an email saying she was "working on NMS initiatives that warrant a loan level review to determine if the inspections required by the Investor/Insurer servicing guides." (Dkt. No. 185-3.) The author of that email, Kim Krakoviak,

10

served as Citi's 30(b)(6) deponent and testified that she "would not say any of the changes were a result of the lawsuit."[9]  (Dkt. No. 185-15 at 13:21–22.)   She also testified she was not even aware of the lawsuit until late 2013 when she was asked to assist with Citi's responses to discovery requests. (Dkt. No. 185-14 at 3.)

Plaintiffs rely heavily on *MacDonald*, 142 F. Supp. 3d at 891–94, for the proposition that they are entitled to an inference of causation unrebutted by Citi.  In *MacDonald*, consumer plaintiffs sued defendant Ford Motor Company alleging certain vehicles were manufactured with a dangerous design defect and that Ford failed to warn customers.  Approximately 14 months after plaintiffs sent their initial demand letter and filed suit, and approximately 5 months following the court's order denying Ford's motion to dismiss in part, Ford initiated a voluntary recall based on the precise safety concern plaintiffs raised in the litigation.  *Id.* at 887–90.  The voluntary recall mooted the majority of plaintiffs' claims and plaintiffs moved for attorneys' fees under Section 1021.5.  *Id*.  At the outset, the district court found that the chronology established an inference that the lawsuit prompted the voluntary recall.  *Id*. at 891–92.  In rebuttal, Ford submitted a declaration from Lilly, an employee who worked as an early warning data trend specialist in its automotive safety office.  *Id*. at 888.  Lilly averred that he first became aware of the safety issue four years prior to the litigation, but took no action.  *Id*.  The month after the district court denied Ford's motion to dismiss, Lilly again looked into the issue after receiving a notice from a Canadian agency regarding the safety issue.  *Id*. 888–89.  Based upon this second investigation, Lilly determined that the safety issue was more prevalent than he previously thought and reported it to Ford's critical concern review group.  *Id.* at 889.  Four months later, the critical concern review group recommended a voluntary recall, which was approved

---

[9]  When Krakoviak was asked at her deposition why the protocol changes were made in 2013 and 2014, she testified she could not respond with any non-privileged information.  (*See* Dkt. No. 175-8 at 23–24.)  Plaintiffs now argue that Citi should be precluded from offering Krakoviak's declaration in opposition to the instant motion because it would sanction using privilege as "both a sword and a shield."  *See Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992).  The Court disagrees given the totality of the circumstances.  Despite not divulging purportedly privileged information, Krakoviak did testify that the changes were not related to plaintiffs' lawsuit and she was not aware of the lawsuit until the end of 2013.  (*See* Dkt. No.185-15 at 13:21–23; Dkt. No. 184-14 at 3.)  Citi also produced to plaintiffs all of the above-cited contemporaneous evidence reflecting that Citi made the changes in response to the NMS.  Plaintiffs' argument that they were somehow prejudiced by a surprise argument that the NMS compelled these changes is simply unavailing.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    that same month.  *Id.*  Ford did not identify or present any testimony from the persons who actually

2    made the recall decision.  *Id.*  Based thereon, the district court found that Ford's evidence did not

3    overcome the presumption that the lawsuit was a substantial factor in the recall decision for three

4    general reasons: (1) it was unconvincing that the letter from the Canadian agency would prompt Lilly

5    to re-analyze the issue when it had received numerous complaints previously; (2) "Ford's timeline

6    relies too heavily on the power of coincidence" given that Ford knew of the defect since at least eight

7    years before the litigation was filed; and (3) "there are significant holes in Ford's evidence as it

8    pertains to the decision-making process behind the recall or as it pertains to the complaint in this

9    case," including the names of the persons who made the decision.  *Id.* at 892–94.

10        *MacDonald* is readily distinguishable.  There, plaintiffs' primary grievance was undeniably

11   known to Ford.  The parties did not dispute that Ford's voluntary recall mooted plaintiffs' precise

12   grievance.  After being aware of the safety issue for nearly a decade, Ford mooted many of plaintiffs'

13   claims in the litigation just weeks after they successfully defeated Ford's motion to dismiss.  Here,

14   the record shows that plaintiffs were not yet focusing on the manner or frequency of property

15   inspection fees in mid-2013.  Thus the inference of causation that arose in *MacDonald* is not justified

16   under the circumstances.  Additionally, Ford's rebuttal evidence was significantly weaker than Citi's

17   is here.  Ford's lone non-litigation impetus was a single complaint from a Canadian authority even

18   though Ford previously received many complaints prior to that letter.  By contrast, a court approved

19   the NMS between Citi and the federal government, 49 States, and the District of Columbia just two

20   days before this lawsuit was filed.  Citi began working on the changes mandated by the NMS months

21   before plaintiffs brought this litigation.

22        In sum, plaintiffs have not shown that this litigation was a substantial motivating factor for

23   Citi to implement changes to its property inspection fee protocol in light of the drastic evolution of

24   plaintiffs' grievances throughout the litigation, the NMS, and Citi's contemporaneous evidence

25   showing it made the changes in response to the NMS.

26    **IV.  CONCLUSION**

27        For the foregoing reasons, the Court **DENIES** plaintiffs' motion for order entitling plaintiffs to

28   a catalyst fee award under Cal. Code Civ. P. section 1021.5 (Dkt. No. 176).

1       This Order terminates Docket Number 176.

2       **IT IS SO ORDERED**.

3  Dated: October 5, 2016

4

5                                YVONNE GONZALEZ ROGERS

6                   UNITED STATES DISTRICT COURT JUDGE

United States District Court
Northern District of California